700 P.2d 98

**Richard J. BERGKAMP and Marilyn Bergkamp, husband and wife, dba Alpine Mexico Saloon, Plaintiffs-Respondents,**

v.

**Thomas CARRICO, dba the Alpine Saloon; Gruener, Inc., an Idaho corporation; SNT, Inc., an Idaho corporation; and Michael A. Martin and Karen T. Martin, husband and wife, Defendants-Appellants.**

No. 14571.

Court of Appeals of Idaho.

April 29, 1985.

Robert M. Tyler, Jr. (Elam, Burke, Evans, Boyd & Koontz), Boise, for defendants-appellants.

E. Lee Schlender, Ketchum, for plaintiffs-respondents.

BURNETT, Judge.

This appeal focuses upon a wrongful eviction of tenants from commercial property in Ketchum, Idaho. The landlords have asked us to review the amount of damages awarded and to determine whether the district court properly allowed prejudgment interest on the award. For reasons explained below, we vacate the damage award and remand the case, but we hold that prejudgment interest may be allowed on the damages ultimately awarded.

This case is on appeal for the second time. The first appeal presented the question whether the landlords, Thomas Carrico, et al., wrongfully had terminated the tenancy of Richard and Marilyn Bergkamp under the terms of a written lease. Our Supreme Court held the lease to be ambiguous and remanded the case for a determination of the parties' underlying intent. *Bergkamp v. Carrico*, 101 Idaho 365, 613 P.2d 376 (1980). The district court subsequently construed the lease, ruling that it did not authorize a termination and that the landlords' action had been wrongful. These rulings are not challenged in the instant appeal.

The district court then turned to the question of damages. Sitting without a jury, the judge heard testimony and received a written report from an appraiser concerning the value of the tenants' lease-

hold interest in the property. The appraiser noted that when the wrongful termination occurred, only ten months remained in the lease term but the tenants had an option to renew the lease for five additional years. The appraiser estimated that if the tenants had been afforded an opportunity to renew the lease, and if they had done so, the value of the leasehold would have been $72,324, of which $69,000 was attributable to the five-year renewal period. However, due to uncertainty as to whether the tenants actually would have renewed the lease, the appraiser reduced the $69,000 figure to $34,500, applying a fifty percent probability factor. By this methodology the appraiser arrived at an adjusted total value of $37,824. The district judge accepted much of the appraiser's report but rejected the application of any probability factor. The judge awarded the full amount of $72,324 for loss of the leasehold, together with other losses not at issue here, and allowed prejudgment interest on the entire amount. This appeal followed.

Although the landlords have raised several issues, we need only discuss whether the judge erred in fixing the value of the leasehold and in allowing prejudgment interest. Other issues, relating to events during the trial and to the judge's subsequent refusal to reopen the case, need not be addressed in light of our decision to vacate and remand.

I

■ We turn first to the value of the leasehold. If wrongful conduct by a landlord results in termination of a lease, and if the parties have not otherwise agreed on the measure of damages, the tenant is entitled to recover the fair market value of the remainder of the lease, together with other losses occasioned by the termination. RESTATEMENT (SECOND) OF PROPERTY, § 10.2 (1976). Factors to be considered in valuing the leasehold include—but are not necessarily limited to—the fair rental value

of the unexpired portion of the lease and the rent reserved (i.e., the rent which the tenant would have paid if termination had not occurred). *San Francisco Bay Area Rapid Transit District v. McKeegan*, 71 Cal.Rptr. 204, 265 Cal.App.2d 263 (1968). *See generally* 49 AM.JUR.2d *Landlord and Tenant* § 323 (1970); Annot., 7 A.L.R. 1103 (1920).

These factors can be illustrated, using data in the present case. The district court was informed that the fair rental value of the premises—if leased on a "gross" basis, with the tenant paying taxes, utilities and maintenance—would have been sixty cents per square foot per month during the remaining term of the lease. The property was presumed to encompass 2,750 square feet, implying a fair rental value of $1,650 per month.[1] Over a period of seventy months (ten months during the primary term plus five years during the renewal term), the property, if rented at its postulated fair value, could have produced a total cash flow of $115,500. In contrast, the rent reserved under the lease was only $350 per month, or $24,500 over the entire seventy-month period. Thus, in this illustration, a gap of $91,000 existed between the fair rental value of the property and the rent reserved under the lease. If the tenants had been able to realize the full rental value, and if they would have incurred no other expenses while doing so, the value of the leasehold on the date of termination would have been the present value, at that time, of an income stream of $91,000 extending over a period of seventy months.

The appraiser deviated from this approach in several respects. As noted above, he was uncertain whether the tenants actually would have renewed the lease. He applied a probability factor to account for this uncertainty. The district judge disagreed, deeming it virtually certain that the tenants would have renewed in light of the highly favorable gap be-

1. This square footage figure was disputed in post-trial proceedings. We use it here solely for the purpose of illustration.

tween the fair rental value and the rent reserved. We believe the judge's reasoning was correct, as far as it went. However, the district judge did not critically examine the underlying assumption that the tenants would have been able to realize the fair rental value. It is undisputed that the tenants' enterprise, known as the Alpine Mexico Saloon, had experienced economic difficulties prior to the wrongful termination. The business was not providing income commensurate with the postulated rental value of the premises. Nevertheless, the tenants, correctly noting that fair rental value would not depend upon the success or failure of a particular business, urged that they could have continued the lease and realized its economic value by subleasing or assigning the attractive leasehold to someone else. The district judge accepted this argument, treating the leasehold as "a saleable item."

Unhappily for the tenants, this assumption conflicts with the lease itself. Paragraph fifteen reads as follows: "Lessee shall not assign or sublease this agreement or any part thereof, without the written consent of the Lessor." It is patently unlikely that the landlords, who terminated the lease and dispossessed the tenants, would have consented to any sublease or assignment for the tenants' benefit.

■ The question, then, is whether paragraph fifteen was material, and should have been considered, in determining the fair rental value of the premises during the remainder of the lease. We believe so. Concededly, our Supreme Court has ruled that where a landlord's consent must be obtained for a sublease or assignment, such consent cannot be withheld unreasonably. *Funk v. Funk*, 102 Idaho 521, 633 P.2d 586 (1981). But the lease here in question was drafted in 1974 and the termination occurred in 1978, several years before *Funk*. At the time of termination, which is the benchmark for valuing the remaining leasehold, any purported sublease or assignment by the tenants, without the landlords' consent, would have been of debatable validity. The Supreme Court in *Funk* expressly acknowledged that its decision was a new departure in Idaho law. *Compare J.R. Simplot Co. v. Chambers*, 82 Idaho 104, 350 P.2d 211 (1960) (declining to impose a requirement of reasonableness upon a contract clause authorizing assignment by the landlord). A majority of other jurisdictions, as noted in *Funk*, previously had declined to interfere with contracts granting landlords unlimited control over subleases and assignments. Consequently, in the present case, any prospective sublessee or assignee would have faced a substantial risk of litigation against nonconsenting landlords.

■ Restrictions against the assignability of a lease may be considered in determining the value of an unexpired term. *E.g., Orange State Oil Co. v. Jacksonville Expressway Authority*, 110 So.2d 687, 690 (Fla.Dist.Ct.App.1959). Here, we believe the district court erred by disregarding the potential impact of paragraph fifteen. Because the impact could have substantially affected the fair rental value of the premises, we believe the damage award must be vacated. The value of the leasehold, burdened by the restriction imposed by paragraph fifteen, is a factual question to be determined by the district judge on remand.

■ For guidance upon remand, we also must comment upon another respect in which the appraiser's report deviated from our illustration above. The appraiser did not value the leasehold directly. Rather, by use of formulas which need not be detailed here, he arrived at a value through an indirect, four-step process. First, he estimated the sale value of the property, free of the leasehold, at the date of termination. Secondly, he projected the sale value of the property when it would revert to the landlords, and he discounted this figure to present value at the date of termination. Third, he computed the present value of rent the landlords would receive during the unexpired portion of the lease. Finally, he added the present value of the reversionary interest to the present value of the rent and subtracted them from the market val-

ue of the property on the termination date. He treated the difference as the value of the leasehold. In essence, then, the appraiser valued the leasehold by measuring the change in the landlord's economic position during the unexpired term of the lease.

This method of valuing a leasehold might be useful to an investor who is considering whether to purchase property subject to an existing lease. But it is fundamentally inconsistent with the criteria we have enunciated for ascertaining a tenant's damages upon wrongful termination. The tenant's loss does not turn upon any gain or loss in the landlord's investment during the lease. Indeed, the landlord's reversionary interest, when discounted to present value, may be influenced largely by factors extrinsic to the lease, such as interest rates, inflation and other market conditions affecting the future sale value of the property. This is not to say that fair rental value is wholly unresponsive to these factors. However, the correlation is imprecise at best. The landlord's gain or loss on his investment is not the yardstick by which a court should measure compensatory damages to the tenant for wrongful termination of a lease.

Rather, the value of the leasehold should be ascertained by factors bearing directly on the tenancy. As we have explained, these include the fair rental value of the property and the rent reserved under the lease. Accordingly, we instruct the district court on remand to consider the fair rental value and the rent to be paid. The court should take due account of any other expenses the tenants likely would have incurred during the remainder of the lease. As noted above, the court also must weigh the effect of the contractual prohibition against subleasing or assigning without the landlords' consent. After determining the likely net cash flow to the tenants during the remainder of the lease, the court should compute the present value of the income stream, using a discount rate appropriate to the date of termination.

## II

■ We next consider the question of prejudgment interest. The district court grounded its award of prejudgment interest upon the law of eminent domain. The court treated the landlords' dispossession of the tenants as tantamount to a taking of property by the government in condemnation. The court correctly noted that if compensation is not paid when property is taken for public use, the owner ordinarily is entitled to prejudgment interest from the date the condemnor acquires possession or becomes entitled to possession. *See, e.g., Independent School District of Boise City v. C.B. Lauch Construction Co.*, 78 Idaho 485, 305 P.2d 1077 (1957). However, we have been unable to find, and the parties on appeal have not cited, any authority suggesting that private evictions should be viewed as public takings. We doubt the wisdom of transplanting an organ of condemnation law into the body of law governing disputes between landlords and tenants. The public and private law perspectives are fundamentally different.

■ Nevertheless, if a district court reaches a correct result despite application of an erroneous legal theory, the result will be upheld on appeal by applying a correct theory. *E.g., Andre v. Morrow*, 106 Idaho 455, 680 P.2d 1355 (1984). We believe that alternate grounds exist for upholding the allowance of prejudgment interest in this case. As mentioned earlier, the tenants were awarded damages in addition to the value of the leasehold. Those damages, undisputed on appeal, were for losses of personal property when the tenants were dispossessed. It has long been established that prejudgment interest may be awarded on damages for misappropriation or conversion of personal property. C. McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 123 (1935); *cf. Davis v. Professional Business Services, Inc.*, (Idaho S.Ct. No. 15112, slip op., March 29, 1985) (noting argument that prejudgment interest is inappropriate on tort claims *other than* for conversion). The loss of personal property here, as a result of wrongful dispossession, so closely resembles a conversion or

wrongful appropriation that the rule of prejudgment interest should be applied.

■ The larger question is whether the value of the leasehold also should bear prejudgment interest. The landlords have argued that it should not. They rely upon decisions awarding prejudgment interest only upon damages that are liquidated or ascertainable merely by mathematical computation. *See, e.g., Taylor v. Herbold,* 94 Idaho 133, 483 P.2d 664 (1971); *Farm Development Corp. v. Hernandez,* 93 Idaho 918, 478 P.2d 298 (1970). However, this limitation of prejudgment interest is not absolute. "[The] limitation is apparently based upon equitable considerations." *United States Fidelity and Guaranty Co. v. Clover Creek Cattle Co.,* 92 Idaho 889, 900, 452 P.2d 993, 1004 (1969). In *Davis v. Professional Business Services, Inc., supra,* our Supreme Court recently allowed prejudgment interest to compensate plaintiffs for "the loss of the use of their money during the pendency of the action."

Section 10.2 of the RESTATEMENT (SECOND) OF PROPERTY (1976), cited earlier in this opinion, recognizes that a tenant's damage award for wrongful conduct of the landlord may bear interest "at the legal rate for the period appropriate under the circumstances." An "appropriate" period may include the interval from the landlord's wrongful act to the entry of judgment if the award of interest would compensate the tenant for a loss in the use of his own money during that time. RESTATEMENT § 10.2 (Reporter's Note No. 13).

Here, we acknowledge that the wrongful termination created a loss of the leasehold, not a direct loss of the tenants' own money. However, as explained in Part I of this opinion, the value of the leasehold is determined by reference to the date of wrongful termination. The income that the tenants could have realized during the remainder of the lease is discounted to present value on that date. Reduction to present value imputes the use of money. It presumes a return upon investment of the present value lump sum. Because the value of a leasehold is computed at present value on the termination date, it would be illogical— indeed, it would be palpably inequitable—to disallow interest from the same date until judgment. Such interest simply represents a return upon the imputed use of money during this period. Without such an imputed use, there would be no conceptual foundation for reducing the income stream during the remainder of the lease to present value.[2]

■ Accordingly, we hold that where a tenant has been dispossessed through wrongful termination of a lease, and where the damage award includes a projected income stream discounted to present value on the date of termination, the tenant is entitled to prejudgment interest on the value of the leasehold from that date. The interest should be computed at the rate provided by I.C. § 28–22–104(1). Our holding is a narrow one. It in no way disturbs the general principle that prejudgment interest is unavailable on damage awards for post-judgment losses or for losses that have not been discounted to present value on a prejudgment date. *Compare, e.g., City of Whittier v. Whittier Fuel and Marine Corp.,* 577 P.2d 216 (Alaska 1978).

The judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion. Because none of the parties is entirely

---

**2.** The manifest unfairness of reducing the income stream to present value, while allowing no prejudgment interest, might also be avoided by computing present value on the judgment date. However, this would be inconsistent with the general rule of valuing the leasehold on the date of termination. Moreover, the present value discount rate and the prejudgment interest rate are not necessarily the same. The discount rate is determined by financial markets at the time of termination. The prejudgment interest rate, unless fixed by contract, is determined by statute. The two rates ordinarily will not coincide. Consequently, we believe the better approach is to allow both a present value reduction on the date of termination and prejudgment interest from that date.

favored by our decision today, we award no costs or attorney fees on appeal.

WALTERS, C.J.; and SWANSTROM, J., concur.