No. 02-064

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 298N

STATE OF MONTANA,

        Plaintiff and Respondent,

v.

CHARLES WALTER FRICK,

        Defendant and Appellant.

FILED

DEC 1 2 2002

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and for the County of Sanders,
The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Chad Wright, Appellate Defender Office, Helena, Montana

    For Respondent:

        Hon. Mike McGrath, Attorney General; John Paulson,
Assistant Attorney General, Helena, Montana

        Robert Zimmerman, Sanders County Attorney, Thompson Falls, Montana

Submitted on Briefs:  November 7, 2002

Decided:  December 12, 2002

Filed:

_____
              Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 Defendant Charles Frick was charged with one count of criminal distribution of dangerous drugs (marijuana) in the District Court for the Twentieth Judicial District in Sanders County. Following trial by jury Frick was found guilty of the charge against him. He appeals from his conviction. We affirm the judgment of the District Court.

¶3 The sole issue on appeal is whether there was sufficient evidence to find Frick guilty of criminal sale of dangerous drugs.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 In December 2000, Steve Montgomery was arrested for driving under the influence of alcohol or drugs and was also cited for driving without insurance and contributing to the delinquency of a minor. At the time of his arrest, Montgomery was serving a three-year deferred sentence for selling dangerous drugs (marijuana.) While being transported to jail, Montgomery offered to be an informant regarding other people involved with the sale of drugs in Sanders County. In exchange, he sought leniency for his offense and to avoid revocation of his deferred sentence. After considering his offer, while Montgomery was in jail, officers met with Montgomery to discuss being an informant. The officers suggested

2

at least four people with whom they could use Montgomery's assistance, but Montgomery later testified that he considered those people "too dangerous" and declined to work against them. However, Montgomery did agree to act as an informant against Frick. The police agreed to use Montgomery as an informant, and the State promised to withdraw any petition to revoke his deferred sentence. The State did withdraw its petition and also dropped the charge that Montgomery contributed to the delinquency of a minor.

¶5      On December 21, 2000, Montgomery met with Sheriff Gene Arnold and Deputy Sheriff Darrell Chenoweth in preparation for a marijuana purchase from Frick. Chenoweth did a pat-down search of Montgomery and searched his pockets for drugs. Chenoweth did not search Montgomery's shoes or socks. After the search, Chenoweth attached a "body wire" to Montgomery's shirt and put the shirt on Montgomery. Arnold then gave Montgomery $60 in $20 denominations and drove his police car to a gas station so that Montgomery could get some change for the drug pruchase. Montgomery went into the gas station, purchased a soda, and walked several blocks to a house rented or owned by Tammy Weeks, Frick's girlfriend at the time. The officers followed Montgomery in their car, and monitored his conversations by way of the electronic listening device with which he was equipped. The officers saw Montgomery approach Weeks' house, but did not see him enter.

¶6      Montgomery went to the house, knocked on the door, and was allowed inside by Weeks. Inside the house, Montgomery allegedly purchased one to two grams of marijuana from Frick. After the alleged purchase, Montgomery left Weeks' house, was followed by Arnold and Chenoweth, and agreed to meet them at the police department. At the police

3

department, the sheriffs retrieved $39 and one to two grams of marijuana from Montgomery's pockets. The marijuana tested positive for a prohibited substance in a field test and crime lab results.

¶7 On April 27, 2001, the State charged Frick by Information with one count of felony criminal distribution of dangerous drugs, in violation of § 45-9-101, MCA. At trial, the State called Montgomery as a witness, and in his testimony, he admitted that the State had agreed to withdraw the petition to revoke his deferred sentence. He admitted that he knew that Frick was his sister's ex-boyfriend and that he did not like Frick in part because of the way he believed Frick had treated his sister. Montgomery then testified regarding his recollection of the alleged drug transaction. He testified that when he entered the house he saw about six people in the house–three children and three adults. The three adults were Weeks, Frick, and a personal friend of Montgomery's, Robert Thompson. Montgomery testified that he went to the bedroom door and knocked on it and that Frick opened the bedroom door. Montgomery testified that he asked Frick if he could buy some marijuana and that Frick agreed to sell marijuana to Montgomery. Frick allegedly pulled a small sandwich bag with marijuana in it from his pocket and gave approximately two grams to Montgomery. Montgomery said that he removed the cellophane wrapper from a pack of cigarettes he was carrying and placed the marijuana in the cellophane. Montgomery testified that he put the cellophane wrapper in his pants pocket, gave Frick $20 for the marijuana, and left Weeks' house.

4

¶8    During Montgomery's testimony, the State played a tape recording of what had been overheard by way of the electronic listening device worn by Montgomery. While some of the voices and parts of the tape were difficult to hear or understand, the tape did record what sounded to be a transaction between Montgomery and another person to exchange $20 for a certain amount of marijuana:

MONTGOMERY: Come here a minute, would you?

[Background voice says something, unable to discern]

MONTGOMERY: No way . . . Don't includes you [Laughs]

BACKGROUND VOICE: I'm glad.

MONTGOMERY: Alright. [Chuckles]

MONTGOMERY: Do you think you could get me a bag of weed? Even a little bit?

VOICE: I don't know.

MONTGOMERY: You don't know?

VOICE: What an eighth?

MONTGOMERY: An eighth, a dime, a twenty, whatever.

VOICE: I'll sell ya–I'll sell ya a little bit.

MONTGOMERY: Alright.

VOICE: Be back.

[Approximate 20 second pause, with four intermittent coughs]

MONTGOMERY: Got anything to put it in?

5

UNKNOWN VOICE: Yeah.

MONTGOMERY: [Incomprehensible words] . . . cellophane here, in my pocket.

MONTGOMERY: How about--how about a twenty?

VOICE: Alright, a twenty would be fine.

VOICE: That'll help you.

MONTGOMERY: Sweet.

[Pause]

UNKNOWN VOICE: There you go.

MONTGOMERY: Okay.

After playing the tape for the jury, Frick's attorney cross-examined Montgomery and questioned Montgomery about several inconsistencies between the tape, prior statements, and Montgomery's testimony when examined by the State. In particular, Montgomery's testimony was inconsistent with regard to whether he knocked on the bedroom door, whether he purchased two grams or four grams of marijuana, whether he paid for the drugs before or after he received the drugs, and whether he went to the kitchen to find a cellophane wrapper to hold the marijuana. Frick's attorney also pointed out that Montgomery had not identified or asked Frick to identify himself during the taped transaction, and that Montgomery did not count out the money, as requested by the sheriffs.

¶9     The jury, before deliberations, received the following cautionary instruction:

You have heard the testimony that Steve Montgomery, a witness, has received a benefit from the state with this case. You should examine Steve

6

Montgomery's testimony with greater caution than that of other witnesses. In evaluating that testimony, you should consider the extent to which it may have been influenced by the receipt of benefits from the government.

Following its deliberations, the jury returned its verdict that Frick was guilty as charged.

## DISCUSSION

¶10    Was there sufficient evidence to find Frick guilty of criminal sale of dangerous drugs?

¶11    When reviewing a jury's verdict to determine whether sufficient evidence exists to support a guilty verdict, we view the evidence in a light most favorable to the prosecution and assess whether any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt. *State v. Lyons* (1992), 254 Mont. 360, 363, 838 P.2d 397, 399.

¶12    The jury found that Frick was guilty of selling marijuana, a dangerous drug, in violation of § 45-9-101, MCA. Frick contends that the jury verdict must be reversed because Montgomery was such an unreliable witness that there was insufficient evidence for a rational trier of fact to find that the State proved each element of the crime beyond a reasonable doubt. Frick further contends that the tape recording of his conversation was incomprehensible and could not have supported the jury's verdict. The State responds that issues of fact and witness credibility are matters which the jury is empowered to decide. The State contends that the jury was properly provided with a cautionary jury instruction that Montgomery's testimony should be closely scrutinized since he received substantial benefits from the State for his testimony, and that in spite of that instruction, the jury found Montgomery credible and that this Court should not "second-guess" the jury.

7

¶13 To support a conviction, the State must prove each element of the crime beyond a reasonable doubt. The elements of the crime charged in this case are set forth in § 45-9-101(1), MCA: "[a] person commits the offense of criminal distribution of dangerous drugs if the person sells, barters, exchanges, gives away, or offers to sell, barter, exchange, or give away any dangerous drug, as defined in 50-32-101." "'To sell [drugs] means to knowingly and intentionally transfer possession or ownership of the [drugs] to another for money or other valuable consideration.'" *State v. Brown* (1988), 232 Mont. 1, 5, 755 P.2d 1364, 1367 (quoting *State v. Martinez* (1985), 216 Mont. 270, 272, 700 P.2d 991, 992). Marijuana is considered a "dangerous drug" within the meaning of § 50-32-101, MCA. *See* § 50-2-222(4)(t), MCA (marijuana is a Schedule I dangerous drug).

¶14 There is little dispute that the State established the basic facts necessary to prove that Frick sold marijuana to Montgomery. The State's expert and Chenoweth's testimony established that the substance recovered from Montgomery was marijuana. The tape recording and the testimony of Montgomery and the officers demonstrated that Montgomery purchased marijuana from someone for $20. While some of the voices are difficult to understand at some points on the tape, the tape is discernible at the point where an apparent drug transaction is taking place. In addition, the tape is corroborated by the physical evidence recovered and Montgomery and the deputy sheriffs' testimony. The remaining factual issue that the jury needed to determine was whether the State proved beyond a reasonable doubt that Frick sold the drugs to Montgomery.

8

¶15  From the record we conclude that a rational trier of fact could find that the State proved beyond a reasonable doubt that Frick was the person who sold the drugs. Chenoweth testified that he witnessed Montgomery approach Weeks' house. Montgomery testified that Weeks was Frick's girlfriend and that Frick lived with her. These facts are not disputed by the defendant. Finally, Montgomery testified that when he entered the house he saw only two adult males, Robert Thompson and Charles Frick, and that he purchased the marijuana from Frick alone. This evidence was sufficient for a rational trier of fact to find that Frick was guilty of selling marijuana to Montgomery.

¶16  Frick insists that Montgomery's testimony was so incredible and motivated by the desire to avoid prison that no rational jury could have found that the State proved beyond a reasonable doubt that Frick sold marijuana to Montgomery. Frick suggests that the numerous inconsistencies between Montgomery's testimony and the tape from the "body wire" further demonstrate the unreliability of Montgomery's testimony. However, we have previously held that "[t]he weight of the evidence and credibility of the witnesses is exclusively the province of the trier of fact. If the evidence conflicts, it is within the province of the trier of fact to determine which shall prevail." *State v. Oman* (1985), 218 Mont. 260, 265, 707 P.2d 1117, 1120. Furthermore:

> Only in those rare cases where the story told is so inherently improbable or is so nullified by material self-contradictions that no fair-minded person could believe it may we say that no firm foundation exists for the verdict based upon it.

*State v. Maxwell* (1982), 198 Mont. 498, 501, 647 P.2d 348, 351 (quoting *State v. Gaimos* (1916), 53 Mont. 118, 126, 162 P. 596, 599). The record reflects that there were inconsistencies in Montgomery's testimony with previous statements and the tape from the "body wire." However, his testimony was also corroborated by the tape from the body wire, and we cannot conclude that Montgomery's testimony was "nullified by material self-contradictions." It was the jury's duty to resolve any conflicts in the evidence, and the jury resolved the conflicts in favor of the State. We conclude that a rational jury could find that the State proved the elements of the crime beyond a reasonable doubt.

¶17 For these reasons, we affirm the judgment of the District Court.

_____
Justice

We Concur:

_____

_____

_____
Justices

10