No. 83-479

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

---

JOANN KYRISS, in her capacity
as Conservator for Frank Templin,

Plaintiff and Respondent,

-vs-

STATE OF MONTANA,

Defendant and Respondent,

and

ROGER A. GANFIELD, M.D. and
LEONARD M. BENJAMIN, M.D.,

Defendants and Appellants.

---

APPEAL FROM: District Court of the Third Judicial District,
In and For the County of Powell,
The Honorable Robert Boyd, Judge Presiding.

COUNSEL OF RECORD:

For Appellants:

James A. Robischon argued, Butte, Montana

For Respondents:

Hoyt & Trieweiler; Terry Trieweiler argued for
Kyriss, Whitefish, Montana
Sharon Morrison, (Kyriss), Helena, Montana
Allen B. Chronister argued for State, Agency
Legal Services, Helena, Montana

---

Submitted: June 13, 1985

Decided: October 3, 1985

Filed OCT - 3 1985

*Ethel M. Harrison*

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

This is a medical malpractice case in which the District Court, Third Judicial District, Powell County, based on jury verdict, entered judgment against Drs. Roger A. Ganfield and Leonard M. Benjamin. The doctors appeal.

The principal issue in the case is whether the District Court properly instructed the jury on the issue of causation using the "legal cause" or "substantial factor" instruction instead of the historic "proximate cause" instruction. We determine that the court instructed the jury properly.

The second principal issue is an outgrowth of the first issue, for the doctors contend that there was not sufficient competent evidence of proximate cause to justify a verdict against them. We determine the evidence is sufficient.

Other issues raised by the doctors include their contention that they were employees, not independent contractors, of the State of Montana and thus entitled to be immunized from plaintiff's judgment under section 2-9-305, MCA; and a further issue respecting the jury's possession of highlighted copies of the plaintiff's prison medical record and color photographs of his right leg. We resolve these issues against the doctors also.

I

Frank Templin is characterized on the prison records as marginally mentally retarded and an alcoholic. He was born in 1922 and finished the 8th grade in ten years. In 1947, he enlisted in the Army from which he received an honorable discharge. He re-enlisted in 1950 and served a tour of duty in the Korean War, and was honorably discharged in 1953 for a

second time. In his Korean duty, he suffered frostbite on both of his feet while working as a heavy equipment operator in building roads.

After the service, he worked in saw mills and as a farm laborer. He drank heavily however in the 1970s, was considered an alcoholic and supported himself with welfare.

In 1973, Templin forged a $30 check drawn on a friend's account to purchase wine. After 141 days in the Lincoln County Jail, he entered a plea of guilty of forgery. He had no prior juvenile record and no prior felony conviction, and on March 7, 1974, he received a three-year deferred sentence. One of the conditions of the deferred sentence was that he complete an alcoholic treatment course at Galen, Montana, and report regularly to a parole officer.

Templin completed the treatment at Galen on May 1, 1974, and then requested permission to transfer his supervision to Minnesota, where he hoped to find farm work. He was given permission. Two weeks after his departure from Montana, when he had not reported to his Minnesota supervisor, he was declared a probation violator. A warrant was issued for his arrest, he was returned to the District Court in Lincoln County and there he was sentenced to 10 years imprisonment in the Montana State Prison at Deer Lodge.

His incarceration at the prison was uneventful. He had no conduct problems, was classified as minimum security risk, did his job assignments, did not need supervision, and was dependable. He was eligible for parole on January 11, 1976 but was apparently denied parole for failure to submit an acceptable work program following parole. Therefore he remained a prisoner at the Montana State Prison, where eventually he sought treatment from Leonard Benjamin, M.D.,

the prison doctor, for an ingrown toenail on September 7, 1977.

We will set out the history of his medical treatment more in detail when we discuss the sufficiency of the evidence issue. It is enough to say now that following the removal of his toenail, over a course of several weeks, and several visits to the prison nurses, the prison doctors, and stops at the prison infirmary, it was decided that he should be released to the Veterans Administration Hospital in Helena for treatment of what was obviously a gangrenous condition of his right foot. The Veterans Administration Hospital would not accept him unless he was paroled. His parole was effected, he entered the Veterans Administration Hospital, and there the lower portion of his right leg was amputated on December 20, 1977.

II

LEGAL CAUSE

During the trial the doctors contended, and they contend on appeal, that Frank Templin was suffering from a pre-existing condition of arteriosclerosis of the blood vessels of the legs, particularly of the right leg, and that it was the arteriosclerosis which brought about the eventual amputation of his right leg.

Templin contended that the doctors were negligent in their medical treatment extended to him. There was also an issue of whether the State of Montana itself had exercised its duty to provide reasonable and ordinary care for the life and health of its prisoner.

The jury was given a special verdict form, which required it to find with respect to each defendant whether that particular defendant was negligent, and whether his or

its negligence contributed as a legal cause of injury or damage to the plaintiff. Those questions related to defendants Roger Ganfield, Leonard Benjamin, Francis Bertoglio and the State of Montana. The jury returned a verdict that Roger Ganfield and Leonard Benjamin were negligent, and that their negligence contributed as a legal cause of injury or damage to the plaintiff. The jury found in favor of the defendants Francis Bertoglio and the State of Montana.

With respect to causation, the District Court instructed the jury as follows:

Instruction No. 13

There may be more than one legal cause of an injury. When negligent conduct of two or more persons contributes concurrently as legal causes of an injury, the conduct of each said persons is a legal cause of the injury regardless of the extent to which each contributes to the injury.

Instruction No. 14

A legal cause of an injury is a cause which is a substantial factor in bringing about the injury.

Instruction No. 18

If you find that any negligent medical practice on the part of the Defendants substantially reduced the chances for saving Plaintiff's leg, then such a reduction in chance can be a part of the legal cause as defined in this instruction.

The District Court refused the defendant's offer of a "proximate cause" instruction, which would have instructed the jury that proximate cause is one which in a natural and continuous sequence and unbroken by any new independent cause produces the injury and without which the injury would not have occurred.

The doctors contend that in refusing the proximate cause instruction, and granting one for legal cause, the District Court is establishing a new standard. The doctors rely on

our decision in Sztaba v. Great Northern Railway Co. (1966), 147 Mont. 185, 411 P.2d 379, where we said that the test most generally employed in determining causation is the "but for" test. The doctors also point to Detert v. Lake County (Mont. 1984), 674 P.2d 1097, where we stated that the plaintiff in a tort case must prove a breach of duty as a proximate cause of the injury, and to Hendrickson v. Neiman (Mont. 1983), 665 P.2d 219, where we stated that to hold a party negligent per se for a violation of the statute, the violation must constitute a proximate cause of the injury resulting in damage.

Thus the doctors place squarely before us an issue of grave importance, namely, is this Court so inseparably wedded to the "but for" rule that in tort cases the liability of the defendant must always be found in terms of proximate cause? We answer no.

We reached this issue shortly ago in Rudeck v. Wright, (Cause No. 84-84, Decided August 27, 1985), ___ Mont. ___, ___ P.2d ___. There we said in part:

> . . . if two or more causes concur to bring about an event, and any one of them, operating alone, would have been sufficient to cause the identical result, some other test is needed. In such cases it is quite clear that each cause has in fact played so important a part in producing the result that responsibility should be imposed upon it; and it is equally clear that neither can be absolved from that responsibility upon the ground that the identical harm would have occurred it, or there would be no liability at all.
>
> The "substantial factor" rule was developed primarily for cases in which application of the "but for" rule would allow each defendant to escape responsibility because the conduct of one or more others would have been sufficient to produce the same result . . .

In this case, the problem has a slightly different context: the doctors argue that a pre-existing condition of

arteriosclerosis caused the result. On that point the doctors seek to escape liability. In Rudeck, we showed that the "but for" rule is one which states that the defendant's conduct is the proximate cause of the event if the event would not have occurred but for that conduct. The inadequacy of the "but for" rule for the purpose of this case should be obvious. Under the "but for" rule, it could be argued, and indeed was argued in the District Court and here on appeal, that the amputation would have occurred in any event, and not only "but for" the negligent treatment by the doctors.

If two causes concur to bring about an injury and either cause would have been sufficient for the result, some test for tort liability other than the "but for" rule is needed. In the case of two such concurring causes, the proximate cause instruction fails because a jury so instructed would face an impossible task: It cannot then find the negligence of one party a cause "without which the injury would not have occurred." It was in grappling with this facet of tort causation that courts developed the "substantial factor" test. Anderson v. Minneapolis, St. Paul and Sault Ste. Marie Railway Co. (Minn. 1920), 179 N.W. 45 aff'd., 185 N.W. 299 (1921).

Our adoption of the "substantial factor" test as applicable to cases where two or more actors or factors may be substantial causes of a harm is relatively late in coming. The rule appeared in the first Restatement of Torts, § 431, and is repeated in Restatement (Second) of Torts, § 431. Other western states have found the requirement of causation to be satisfied where the negligent act complained of is a substantial factor is causing plaintiff's injury. Alvey v. Pioneer Oil Field Services (Alaska 1982), 648 P.2d 599;

Blackledge v. Harrington (Or. 1981), 624 P.2d 119, rev'd. 634 P.2d 243 (1981); Thomsen v. Rexall Drug and Chemical Company (1965), 235 Cal.App.2d 755, 45 Cal. Rptr. 642; Mitchell v. Branch (Hawaii 1961), 363 P.2d 969; Phelps v. Woodward Construction Co. (Wyo. 1949), 204 P.2d 179.

Our adoption of the "substantial factor" test is in accord with dicta found in Moen v. Peter Kiewit and Sons Co. (Mont. 1982), 655 P.2d 482, 490, and Kiamas v. Mon-Kota, Inc. (Mont. 1982), 639 P.2d 1155.

III

Sufficiency of Evidence

The doctors contend that there was not sufficient competent evidence of proximate cause to justify a verdict against them in favor of the plaintiff. They state that although Templin's expert witness, Dr. Tom E. Norris, offered evidence of improper medical treatment by the defendant doctors, at no time did Dr. Norris testify that any of the allegedly negligent acts or omissions of the doctors were the proximate cause of the injury to Templin. The defendant doctors then rely on the argument that proof of proximate cause is necessary to establish liability. Since the "but for" test is one of exclusion, the doctors contend that their conduct is not the cause of the injury, if the event would not have occurred without it.

In support of their contentions, defendant doctors point to the cross-examination of Dr. Manuel White, who testified that the blockage in Templin's artery was caused by arteriosclerosis, and that this is a progressive disease, which may have existed as early as two years prior to the toenail incident. The doctor further stated that it was the

interruption of the blood supply at the popliteal artery of the right leg that caused the development of gangrene.

We have already indicated above that in this case it was proper to apply the "substantial factor" test and not the "but for" rule to determine the liability. Nonetheless because an issue is raised as to the sufficiency of the evidence, we set out from the viewpoint of Templin the testimony which supports the verdict in favor of Templin.

It is first necessary to understand that under a contract with the prison authorities, it was a duty of Dr. Benjamin, or someone from his office, to provide medical care to prison inmates and that this obligation extended to Frank Templin during the times involved in this case.

Dr. Benjamin first examined Templin in 1974 and got from Templin then a history that Templin had frostbite on his feet while in the service in Korea.

On July 18, 1977, Templin was seen by a nurse at the prison, complaining that his leg was going to sleep when he was lying in bed, sitting, or walking too much. The doctor testified that these symptoms are signs of circulatory deficiency similar to claudication, which is pain in the muscle or part of the body which lacks circulation.

On September 7, 1977, Nurse Kathleen Scalise saw Templin at the old prison medical station. She found him in a great deal of pain with a reddened and swollen foot. His right great toe was red and inflamed and tender to touch. She advised him to place his name on the next day's sick call when Dr. Benjamin was scheduled to be there.

On September 8, 1977, Dr. Benjamin examined Templin's right foot. Templin was complaining of a very sore toe. Benjamin determined that Templin had a circulatory

insufficiency in his right lower leg. The doctor was unable to find a pedal pulse. There were atrophic changes in the right big toenail and venous swelling of the foot. Dr. Benjamin prescribed removal of the toenail on the following day.

On September 9, 1977, Dr. Ganfield, who is the associate of Dr. Benjamin, removed the toenail and sent Templin back to prison. The doctor admitted that the prison environment was not sanitary and that he could at that time have admitted Templin either to the prison infirmary or to a hospital, or he could have referred Templin to a vascular surgeon.

On September 10, 1977, a licensed practical nurse, Jackie Beatty, saw Templin several times during the day. He was suffering pain for which she gave him a pain pill. She cleansed his toe, and applied an ointment. She observed a small amount of bleeding on the surface of his right great toe, but no signs of infection. She saw him again on September 11, 17, and 18 for observation and treatment. During that time he was still being housed at the old prison.

On September 20, 1977, Dr. Benjamin prescribed an antibiotic for Templin because he observed an indication of infection in the area of the right great toe. On September 25, 1977, Nurse Beatty observed Templin again. At this time his right large toe was black, and there was drainage. She soaked his foot, recorded the condition of the foot, and reported the condition to the doctor. Nurse Scalise also saw him at the medical station, and observed that he was walking with difficulty, that his toe was black and that there was a reddened area over his right foot. He seemed unable to place any weight on his foot.

On September 26, 1977, he was again seen by Dr. Benjamin, at the old prison medical station, and he decided that Templin should be admitted to the prison infirmary. After three days, Templin was discharged from the infirmary by Dr. Benjamin and went back to the prison on September 29.

On September 30, 1977, Templin was again seen by Nurse Beatty. Again his right toe was reddened, swollen and dark black in color. However, red streaks were starting up the right foot above the great toe. The nurse understood that the redness indicated infection. There was also a purulent drainage, which also indicates infection.

Dr. Ganfield saw Templin in his office on September 30, 1977. Dr. Ganfield described his foot as having "mild swelling, with several cuts noted on the ball of his foot and heel." Dr. Ganfield did not require Templin to be hospitalized, nor send him to the infirmary, nor did he consult with any surgeons or vascular specialists respecting the condition of the foot, nor order a culture to determine the type of infection present. Again, Templin returned to the old prison.

On October 1, 1977, Nurse Beatty again saw Templin at the old prison medical station. He still had purulent drainage around the upper part of his right great toe, and it was reddened and inflamed. She saw him again on the next day, October 2, 1977, made the same observations, and indicated he was having difficulty trying to walk. She personally notified Dr. Ganfield of the signs of infection on the right great toe. Dr. Ganfield changed the antibiotic, but did nothing further.

Dr. Benjamin saw Templin October 4, 1977, and at that time knew that Templin had an infection in his right great

toe. He did not however change his course of treatment. Dr. Benjamin also saw Templin on October 11, 1977.

After a lapse of three weeks, Dr. Benjamin again saw Templin on November 4, 1977. At that time he admitted Templin to the infirmary. Nurse Beatty observed that his right foot was reddened, his toe black with purulent drainage, and also now noticed a foul odor coming from his right great toe. Dr. Benjamin testified that on this date, Templin showed definite evidence of gangrenous changes in his toe and heel. Dr. Benjamin then decided that Templin should be released to the Veterans Administration Hospital in Helena, but that hospital would not accept Templin because he was not paroled.

Glen McElderry, a licensed practical nurse, worked at the prison and saw Templin in the month of November. Two days after Templin's admission to the infirmary, McElderry noticed a red streak going up Templin's right leg which seemed to come from the infection in his toe. The doctors were kept advised of Templin's condition.

On November 4, 1977, however, Templin had been sent to the Powell County Hospital in Deer Lodge so that a culture could be taken from his big toe. This was done at Dr. Bertoglio's instruction. Dr. Bertoglio diagnosed his condition as an infected toe with a vascular insufficiency and the culture showed a staph aureus infection. That information was communicated to Dr. Benjamin.

By November 17, 1977, McElderry determined by measuring that the length of the red streak on Templin's foot and leg was 8 inches. He felt that Templin's infection was getting worse. McElderry testified that Templin showed more deterioration than improvement while he was in the infirmary.

Templin was hospitalized at the Veterans Administration Hospital in Helena on November 23, 1977. There he was examined by Dr. Manuel White, a specialist in vascular and thoracic surgery. In his examination of Templin, he found good pulses in both groins, but no pulses in his feet or behind his knees. He also observed a dark discoloration of the great toe of Templin's right foot. There was moderate swelling of both feet which was worse on the right, a missing toenail on the right toe, and a foul odor. Dr. White ordered an arteriogram. This type of X-ray film revealed that the blood circulation in Templin's right leg was blocked at the popliteal and the lower portion of the superficial femoral arteries, that is, behind the knee and the lower part of the thigh. He determined that Templin was suffering from arteriosclerosis, which is a narrowing of the arteries by thickening of the walls. The process of arteriosclerosis had been going on at least two years. He found, however, that the actual blockage in this case had resulted from blood clots which had developed relatively recently. Dr. White determined that surgery was necessary in order to relieve the clogged vessels and to re-establish circulation. He operated on Templin on December 12, 1977, and removed the blood clots. He felt he had restored good circulation to the area where the clots had been removed. The gangrenous condition which he observed, however, was not reversed. It became necessary on December 20, 1977, for Dr. White to amputate below the knee of Templin's right leg. The amputation was necessary because of gangrene and pain.

Dr. Tom Norris, plaintiff's medical expert, reviewed Templin's medical records. He expressed an opinion that for a patient who had Templin's symptoms on September 7, 1977,

and who had also indications of poor circulation in his right leg, the vascular problem should be dealt with first and then the toenail problem. The reason is that surgery to an extremity where there is a significant vascular lessening presents a greater risk and the tissue is more prone to complications due to the possibility of infection. An infection in an area where blood supply is lessened will produce complications more grave than if there are no vascular problems.

Dr. Norris testified after a toenail is removed from a patient in Templin's condition that the following care must be more cautious than usual. The patient should not be returned to an unsanitary environment. A determination should be made of what bacteria is causing the infection so as to treat the infection with appropriate antibiotics. Aggressive treatment of the infection is necessary. If the infection continues to worsen and the circulatory problems are contributing to the worsening, it would be prudent to have vascular surgical consultation. Because of the nurse's observations on September 25, the patient should have been hospitalized, careful evaluation of the infection by culture should have been made, and intensive therapy with antibiotics and consultation of a vascular surgeon should have occurred. The time loss of two months almost certainly lessened the chance of preventing amputation, and may have led to the necessity of taking a larger part of the leg than earlier treatment would have allowed. By November 4, under the condition of Templin's leg at that time, the foot probably could not have been saved, but it might have been possible to complete the amputation at the ankle level. No standard of medical care would make it reasonable to leave Templin in the

infirmary without vascular consultation for 19 days after November 4, 1977.

We will not repeat all of the admissions with respect to the care made by Dr. Benjamin and Dr. Ganfield. They readily admitted that persons with vascular problems are more prone to infections after surgery, that careful management of persons with vascular complications is necessary and that persons with gangrenous conditions appearing need careful management.

When the sufficiency of evidence to support a jury verdict is attacked, the function of this Court is to determine if there is substantial credible evidence in the record to support the verdict. We review the evidence in the light most favorable to the party that prevailed in the District Court, the presumption on appeal being that the determination of the trial court is correct. Gunnels v. Hoyt (Mont. 1981), 633 P.2d 1187; Groundwater v. Wright (1979), 180 Mont. 27, 588 P.2d 1003; Koger v. Halverson (1952), 125 Mont. 560, 242 P.2d 273.

There is substantial credible evidence in this record to support the verdict of liability against the doctors in this case.

IV

Highlighted Copies

The doctors contend that the trial court abused its discretion in allowing highlighted copies of Frank Templin's medical records to go to the jury in its deliberation.

During the deposition of McElderry, as he was referring to medical records of Templin, he was instructed by the examining counsel to highlight portions of the record for his

testimony. These highlighted instruments were admitted into evidence.

There were other copies of medical records not highlighted in evidence which were also provided to the jury during deliberation. The doctors objected to the highlighted records going to the jury and contend that if the court had kept the highlighted copies out, the jury would have been deprived only of the highlighting and not of any of the information contained in the medical records.

The supervision of the trial process is a matter in the hands of the district judge. We find no manifest abuse of discretion under this issue on the doctors' contention. It is plain that under section 25-7-404, MCA, upon retiring to deliberation, the jurors may take with them all papers which have been received as evidence in the cause, except depositions or papers which ought not to be taken from the person having them in possession. The statutory direction is clear.

Doctors also claim patent error because the District Court allowed photographs of Templin's right leg to go to the jury rather than have Templin exhibit the leg to the jury. No objection was made at trial, so we do not find error on this point.

V

Independent Contractors

(We treat this issue although the State contends that a proper notice of appeal was not timely filed as to the judgment in favor of the State. In any event, the issue must be resolved for the State.)

The doctors contend that they were not independent contractors, but were employees of the State of Montana, and

as such were entitled to the protection of immunity provided by employees of the State under section 2-9-101(2), MCA.

The particular statutory provision follows:

"Employee" means an officer, employee, or servant of a governmental entity, including elected or appointed officials, and persons acting on behalf of the governmental entity in any official capacity temporarily or permanently in the service of the governmental entity whether with or without compensation, but the term employee shall not mean a person or other legal entity while acting in the capacity of an independent contractor under contract to the governmental entity to which parts 1 through 3 apply in the event of a claim.

It is the contention of the doctors that they were employees in this case because they were hired by the State of Montana and they performed services or functions under the direction and control of the employer.

The facts relied upon by the doctors are that Dr. Benjamin was the only doctor employed by the State of Montana for a number of years and that he was employed as a prison physician. The State of Montana provided Dr. Benjamin with the facilities and a place for examining and treating the Montana State Prison inmates. Nursing and other medical supportive services were provided by the State to assist Dr. Benjamin in his treatment and examination of the inmates. Medications prescribed by Dr. Benjamin were filled and administered through the pharmacy at the prison.

The doctors contend that although the prison did not control the actual treatment that Dr. Benjamin gave to various inmates, the prison did control and direct the manner, the time and the availability of the medical services provided to the inmates. The prison establishes days of the week when prisoners are able to obtain medical services and the time of day that the services are to be provided. Any arrangements concerning the release of inmates for treatment

outside of the prison had to be made through the prison administration.

Dr. Benjamin was paid for his medical services on a salary basis and not by fee for each particular service rendered, and was classified as a Physician IV for the Montana State Prison and the Department of Administration Personnel on October 31, 1974. The prison could terminate Dr. Benjamin's services if it desired, and Dr. Benjamin participated in the Montana Public Employees Retirement System.

Dr. Ganfield, who had no contract with the State, contends he was involved in the treatment of the plaintiff on various dates when he acted in the role of a loaned servant to the medical personnel at the Montana State Prison. See Kish v. Montana State Prison (1973), 161 Mont. 297, 505 P.2d 891.

On the other hand, Templin points out that no other person than Dr. Benjamin's firm, the Deer Lodge Clinic, provided regular medical care to prison inmates during 1977. If specialists were required, they had to be recommended through Dr. Benjamin's office. He retained the right to refer inmates at his discretion for additional specialized care and he was permitted to perform services that were necessary in the infirmary or at the Powell County Hospital, depending upon his discretion. The criteria for referring prisoners to other specialists were no different than for referring any other patient in the community. The standard of care that he was expected to provide was the same as the standard of care for any other member of the community.

The District Court determined that the doctors were "independent contractors" and did not meet the definition of employee.

First, Dr. Ganfield does not meet the test for a "loaned servant" established in Kish v. Montana State Prison, 161 Mont. at 297, 505 P.2d at 891. In whose business was he engaged? Although the prison has a direct and compelling interest in the health of the prison inmates, it is apparent from the record that Dr. Ganfield was conducting an independent business as a physician and surgeon in Deer Lodge, and that incidental to his independent medical practice, he had occasion to treat Templin. Under whose control, domination or direction was Dr. Ganfield? Again, the record is clear that in administering medical services to Templin, Dr. Ganfield relied on his own expertise in the medical field and on the opinion of Dr. Benjamin, another practitioner in the medical field. It is certain that the State of Montana could not control, dominate or direct what kinds of medical services, what diagnoses, and what treatments he should accord Templin.

Almost for the same reasons that the loaned servant doctrine does not apply to Dr. Ganfield, Dr. Benjamin must be considered an "independent contractor." In Standard Chemical Manufacturing Company v. Employment Security Division, Department of Labor (1980), 185 Mont. 241, 605 P.2d 610, 612, we set forth tests for determining whether persons were independent contractors or employees for the purpose of unemployment compensation tax. The conditions which must exist to determine that personal services are not part of an employment are that the individual is free from control or direction over the performance of his services, in fact and

under his contract; that the services are outside the usual course of the business for which the services are performed; and that the person performing the services is customarily engaged in an independently established trade, occupation, profession or business.

The medical services rendered to Templin by Dr. Benjamin were completely within his medical discretion, without direction or control from the prison authorities; the prison authorities are not, nor could they be, engaged in the practice of medicine. Dr. Benjamin was customarily engaged in an independently established profession as a practicing member of a medical clinic in Deer Lodge.

We hold that Dr. Benjamin was an independent contractor in the case at bar, and that Dr. Ganfield was not a "loaned servant." Each is directly responsible, and the State is not responsible on their behalf for the medical services the doctors provided to Templin.

VI

Cross-Appeal

Templin cross-appeals on two grounds, that the District Court should have directed a change of venue in this cause, and that the Court improperly refused to tax the costs of depositions used in the trial.

The cross-appellant Templin has asked us to affirm the judgment obtained by him in the District Court, sitting in Deer Lodge County, as against the contentions of the appellant doctors. We have determined that affirmation is proper. The issue, therefore, of venue in the District Court is no longer before us, since we do not order a retrial.

After the verdict Templin attempted to tax, in his costs bill against the doctors, his expenses incurred for the

depositions of Drs. Tom Norris, Leonard Benjamin and Roger Ganfield. On a motion by the doctors to tax costs, the costs of depositions of the doctors were refused by the District Court.

Templin contends that the depositions were used in the trial of the case and accordingly the costs of taking depositions are properly awarded to the prevailing party. Morrison-Maierle, Inc. v. Selsco (1980), 186 Mont. 180, 606 P.2d 1085; Pfizer v. Madison County (1973), 161 Mont. 261, 505 P.2d 399.

The doctors respond that the depositions were all discovery depositions, and that the videotaped deposition of Dr. Norris was stipulated to by the doctors as a matter of convenience for the reason that Dr. Norris could not otherwise be present at the trial. The doctors contend that the depositions were not "used" in the trial, and that the District Court so found, although Templin contends that the depositions were used for purposes of impeachment.

Our problem in resolving this issue is that we do not have before us a transcript of the proceedings in the District Court and accordingly have no record on which to make a decision. We have no basis, therefore, on which to disturb the determination of costs by the District Court.

VII

The judgment of the District Court is affirmed in all respects. Costs on appeal to respondent.

_____
                Justice

- 21 -

We Concur:

_____
Chief Justice


_____


_____


_____
Justices

Hon. William Speare,
District Judge, Sitting
for Mr. Justice Frank B.
Morrison, Jr.

Mr. Justice L. C. Gulbrandson, dissenting.

I respectfully dissent.

In my view, the defendant's proposed instruction on "proximate cause" should have been given to the jury.

The "substantial factor" test was clearly developed for the situation where two causes concur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result. That special situation obviously does not occur often and is not present in this case.

The majority appear to have adopted the rule as set forth in the Restatement (Second) of Torts, § 431, but have ignored the requirements of §§ 430, 433, 433A and 434. Restatement (Second) of Torts, 1965 Edition.

Section 433, with comment (a) reads as follows:

> Considerations Important in Determining Whether Negligent Conduct is Substantial Factor in Producing Harm.
>
> The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:
>
> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
>
> (c) lapse of time.
>
> See Reporter's Notes.
>
> Comment:
>
> a. The considerations stated in this Section are important in three

23

particulars. First, they are important as considerations which the jury should take into account when the substantial factor question is left to them. Second, they are important to the trial judge in so framing his instructions as to call the jury's attention to such of these considerations as are pertinent to the facts which the jury might reasonably infer from the evidence. Third, they are important to a court in determining whether upon the evidence there is room for a reasonable difference of opinion as to whether the defendant's negligence is a substantial factor in bringing about the other's harm.

Court's instruction no. 14, "A legal cause of an injury is a cause which is a substantial factor in bringing about the injury" was the only definitional instruction given the jury, and, in my opinion, is incomplete and inadequate.

The case of Alvey v. Pioneer Oilfield Services (Alaska 1982), 648 P.2d 599, has been cited in the majority opinion as supporting authority for the "substantial factor" rule. That case cites Sharp v. Fairbanks North Star Borough (Alaska 1977), 569 P.2d 178, where the following is set forth on page 181:

Among the elements adopted by this court as necessary to make out a claim for relief based on negligence is "[a] reasonable close causal connection between the conduct and the resulting injury. . . [proximate cause]." More specifically, negligent conduct may properly be found to be a "legal cause" of a plaintiff's injury if the negligent act "was more likely than not a substantial factor in bringing about [the] injury." This test was further clarified in State v. Abbott, where we said:

"Normally, in order to satisfy the substantial factor test it must be shown both that the accident would not have happened 'but for' the defendant's negligence and that the negligent act was so important in bringing about the injury that reasonable men would regard it as a cause and attach responsibility to it."

The citations to earlier Alaska cases indicate that the Supreme Court of Alaska has adopted the Restatement (Second) as set forth in §§ 430, 431, 432, 435 and others,

I would agree if this Court were to adopt §§ 430 through 435, Restatement (Second) of Torts, 1965 Edition, and would reverse and remand for a new trial with appropriate jury instructions.

<u>                             </u> ,
Justice