JUSTICE SHEEHY,
dissenting:
*40 This widow, Olive M. Heltborg, now shares the all-too-often experience of plaintiffs whose money damages verdicts are consistently (or better yet, inconsistently) reversed by the majority of this Court: It is like rowing a boat upwind among the ice floes on a wintry afternoon. The judicial climate here is not just frosty, it is freezing.
Take this case. Please.
This lawsuit is not about wrongful discharge from employment. Early in the game, the District Court removed wrongful discharge as an issue by granting summary judgment in favor of the defendant. There has been no appeal from that decision of the District Court. Yet here the majority confuse this case in their opinion as one for wrongful discharge.
The majority opinion overall has these principal effects, all deleterious to formerly accepted principles of law:
(1) Limiting actions for breach of the implied covenant of good faith and fair dealing to intentional breaches, thus eliminating any causes of action for negligent breaches.
(2) Delimiting the scope of expert testimony.
(3) Confusing the latitude of employers to make business decisions with concepts relating to the covenant of good faith and fair dealing.
(4) Preventing punitive damages even for intentional breaches of the covenant
I.

Negligence and the Covenant of Good Faith and Fair Dealing.

The majority do not recognize or seem to know that the source of the implied covenant of good faith and fair dealing in contract relationships is not in the contract terms, but is implied by law. The fundamental error of the majority is their belief that the implied covenant was bargained for by the parties. In this, the majority “adopt” the errant reasoning of the California Supreme Court in Foley v. Interactive Data Corporation (1988), 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, and ignore, as did the California Supreme Court, the lucid explanation of the source of the implied covenant furnished by Justice Kaufman in his dissent:
“In attempting to emphasize its contractual origins, the majority characterized the covenant of good faith and fair dealing as a ‘contract term... aimed at making effective the agreement’s promises’... That characterization is simply incorrect under the decisions of this Court and the authorities on which they rely. It is true that the law implies in every contract a duty of good faith and fair dealing ... The duty to *41 deal fairly and in good faith with the other party to a contract however ‘is a duty imposed by law, not one arising from the terms of the contract itself. In other words this duty of dealing fairly and in good faith is nonconsensual in origin rather than consensual’... While the nature of the obligations imposed by this duty is dependent upon the nature and purpose of the contract and the expectations of the parties, these obligations are not consensual, not agreed to in the contract; they are imposed by law and thus reflect a normative value of society as a whole ... The interest which the duty of good faith is designed to preserve and protect is essentially not the parties’ interest in having their promises performed, but society’s interest in protecting its members from harm on account of nonconsensual conduct ...” (Emphasis in original; citations omitted.)
Foley, 254 Cal.Rptr. at 251, 765 P.2d at 412, 413.
When viewed from this context, the duty of good faith and fair dealing implied in contractual relationships is no different from the duty imposed by or found in law in any other relationship. A breach not only harms the party directly involved, but the harm accrues to society as a whole, and affects its stability and peace. The covenant is based on considerations of justice and fair play, applicable to all societal relationships. The covenant rises in contract cases not because the parties agreed to it, but because society as a whole imposes the covenant as a duty, a breach of which is not a breach of contract, but a wrongful act properly treated as a tort, since the wrong inflicts damages on the party wronged and the public fabric as a whole.
In Nicholson v. United Pacific Insurance Company (1985), 219 Mont. 32, 41-42, 710 P.2d 1342, 1348, we described the covenant:
“... the nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously or unreasonably, that conduct exceeds the justifiable expectations of the second party. The second party then should be compensated for damages resulting from the other’s culpable conduct.”
Note that in Nicholson, this Court said that the implied covenant would be breached by a party acting “arbitrarily, capriciously, or unreasonably.” When a party acts arbitrarily or capriciously, he is probably acting intentionally. If he is acting unreasonably, he may be acting intentionally, but he may be also acting negligently. It is the public policy of this State that a person acting negligently is also *42 responsible for his acts or omissions if others are harmed thereby. Witness the statute:
“27-1-701. Liability for negligence as well as willful acts.
“Except as otherwise provided by law, everyone is responsible not only for the results of his willful act but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person except so far as the latter has willfully or by want of ordinary care brought the injury upon himself.”
No matter how the majority may try to slice it otherwise, it was firmly established in our cases that a negligent breach of the duty of good faith and fair dealing was actionable in this State. In Crenshaw v. Bozeman Deaconess Hospital (1984), 213 Mont. 488, 693 P.2d 487, 493, this Court (Harrison, J.) stated:
“In light of the foregoing, we find the Hospital’s conduct showed a ‘want of attention to the nature or probable consequence of the act or omission’ and that their conduct fell below the ‘standard established by law for the protection of others against unreasonable risk.’ (Citing authority.) The allegation of negligence was clearly established in respondent’s complaint. We hold the trial court committed no error in issuing the instructions to the jury.”
In Flanigan v. Prudential Federal Savings and Loan Association (1986), 221 Mont. 419, 720 P.2d 257, 263, this Court (Morrison, J.) said:
“Negligence has been recognized by this Court to be a proper basis for recovery in wrongful termination cases. Negligence was approved by this Court in Crenshaw v. Bozeman Deaconess Hospital (Mont. 1984), [213 Mont. 488,] 693 P.2d 487, 493, 41 St.Rep. 2251, 2259, ...”
A reasonable belief in job security as a ground for application of the duty of good faith and fair dealing was acknowledged in Kerr v. Gibson’s Products Company of Bozeman (1987), 226 Mont. 69, 733 P.2d 1292, 1295 (Turnage, C.J.) where we said:
“The covenant of good faith and fair dealing is implied when objective manifestations by the employer give rise to the employee’s reasonable belief that he or she has job security and will be treated fairly. (Citing authority.)
“Gibson’s repeatedly acknowledged respondent’s work as satisfactory through promotions and pay increases. It was reasonable for respondent to believe that she had job security and would be treated fairly.”
*43 Generally, we can anticipate that most breaches of the duty of good faith and fair dealing will be intentional on the part of the employer. Since it is the policy of the law under our Constitution of Montana (Art. II, § 16) to afford a speedy legal remedy for every injury of person, property or character, no sound legal reason can be advanced, and the majority advance none, why negligent breaches of the duty, which can be just as damaging to the wronged party as an intentional breach, should not find a remedy in our courts.
We turn now to the specifics of this case, and our first observation is that the recitation of facts in the majority opinion slant toward the employer. This occurs because of the belief of the majority that this case involves an attack by Heltborg on the right of the employer to engage in a reduction in force. Nothing of the kind. Heltborg did not contest the right of Modem Machinery to reduce its work force. Rather, he contended that in reducing its work force it acted arbitrarily, negligently and unfairly and thus breached the duty of good faith and fair dealing in the employment contract.
On appeal from a jury verdict, the evidence in the case is viewed in the light most favorable to the prevailing party, and, if the evidence conflicts, credibility of the witnesses and the weighing of the evidence are in the province of the jury and not the Supreme Court. Kukuchka v. Ziemet (1985), 219 Mont. 155, 710 P.2d 1361. This Court reviews evidence in the light most favorable to the party that won in the District Court, because of the presumption on appeal that the determination of the trial court is correct. Kyriss v. State (1985), 218 Mont. 162, 707 P.2d 5.
From the viewpoint of the successful claimant, the facts are better stated thusly: Otto Heltborg worked continuously for Modern Machinery, or its predecessors, for over 22 years. In a brief and shocking meeting, on April 30,1988, he was summarily fired, without notice, and without any opportunity to continue in his job. At the time he was a Service Manager, a position that was essential to the continued operation of Modern Machinery. The man who fired him admitted this and also admitted that Heltborg’s job remained the same after he was fired. It was just Otto Heltborg and his salary that were eliminated. The company carried “key man” insurance on bis life.
Heltborg was the highest paid salaried employee of Modern Machinery when he was fired. The decision to fire him was based on his salary. His job was taken over by people who were being paid less. *44 After Heltborg was fired, his successor employee spent 95 percent of his 8 hour shift for over 2 1/2 years doing the job that Heltborg had previously done. Two other employees also took some of the responsibility Heltborg had, after he was fired. Within weeks after Heltborg was fired, Modern Machinery hired additional employees, turned a profit in that year, and paid its president a handsome bonus.
Modem Machinery presented a hard-nosed defense to justify the the termination of Heltborg. It established through its witnesses and in cross-examination of others that Modern Machinery was losing $175,000 a year; that no state law requires that notice be given to the employees before they are discharged; that it was not bad faith not to give a long-time employee severance pay; and that Heltborg was an at-will employee.
The District Court discerned the issues of this case early in the proceedings. In denying Modern Machinery’s motion for a summary judgment on the breach of covenant count, she said:
“In this case there is a question of material fact, regarding the legitimacy of the reduction in force, that must be resolved by a jury. While defendant argues that defense of economic necessity entitles it to summary judgment as a matter of law, plaintiff argues that the economic necessity and reduction in force defense is not legitimate because plaintiff’s husband’s job duties continued, but were performed by remaining employees. Plaintiff argues that there was not a reduction in force, but a reduction in salary, and that her husband was fired because he was one of the highest paid employees, not because of lack of work.”
It was on that stance that the issues went to the jury. The District Court instructed the jury that the law does not require an employer to adopt or maintain a particular set of personnel policies and procedures, and that there was no rule of law that requires an employer to give preference to longevity, give notice or pay in lieu of notice or severance pay, give employees a right to displace another employee at the time of discharge, give employees any right to be rehired, or require the employer to find other employment for the discharged employee within its own company or elsewhere. On the other hand, the District Court instructed the jury that in this case a duty of good faith and fair dealing had arisen during his employment and existed at the time of his termination. It stated, however, that the covenant of good faith and fair dealing in a long-term relationship did not foreclose the employer from engaging in legitimate reductions in force *45 necessary to maintain the economic vitality of the company, and that in determining whether or not Modem Machinery violated the duty of good faith and fair dealing, the jury had to balance the interest of the defendant in controlling its work force with the interest of the plaintiff in job security. The District Court told the jury that an employer is entitled to be motivated by and to serve its own legitimate business interest, and had to be given discretion in determining whom it would employ and retain in employment.
The District Court then instructed that under the implied obligation of good faith and fair dealing, the nature and extent of the obligation depend on the reasonable expectations of the employee based on the employer’s actions. As triers of fact, the jury was told that they had to determine whether the defendant had shown a fair and honest reason for termination, taking into account all of the facts and circumstances in reaching their decision. The court then told the jury that when the legal duty to act in good faith in employment relationships exists, a duty was imposed upon the employer to exercise reasonable care in carrying out decisions concerning employment. The District Court said that this meant that there was a duty on the part of the employer to use reasonable care under the circumstances in carrying out its business decision-making. In this particular, the court relied on Flanigan, 720 P.2d at 263.
The court also instructed the jury that the employer’s right to reduce its personnel did not excuse its obligation to act fairly and in good faith in the process and manner of termination of employment.
It is clear that the instructions given to the jury by the District Court were proper, and were based upon express decisions from this Court. The majority of this Court have found no error in the instructions given, nor could they. Rather, the majority accomplishes a reversal here by jerking out from established law the concept of negligence, in a retrofit of law pertaining to a breach of the covenant.
Particularly, the District Court avoided the problem raised in Hobbs v. Pacific Hide and Fur Depot (1989), 236 Mont. 503, 771 P.2d 125, where this Court reversed because the instructions “did not tell the jury that the implied covenant is measured in a particular contract by the justifiable expectations of the parties.” Of course, the District Court could not have anticipated the about-face taken by the majority in this case.
In denying the post-trial motion of Modern Machinery for judgment notwithstanding the verdict, the District Court pointed out that *46 the arguments made for that motion were the same as for the summary judgment motion and said:
“These factual issues precluded summary judgment and had to be decided by a jury. The jury heard the evidence and found in favor of plaintiff. Obviously, the jury did not believe that defendant had a fair and honest reason to discharge Otto Heltborg or that the reduction in force was legitimate or that the manner in which it was carried out was fair.
“The jury’s verdict was supported by evidence put on by plaintiff that defendant selected the most highly paid employee in the shop for discharge, that his job continued to be done, that his job was essential to the continued economic viability of the company, and that his job was done by a lesser paid employee.”
In a way, it is too bad that Heltborg’s widow utilized negligent breach as well as purposeful breach in pressing her claim in the District Court, for the evidence points as strongly to an intentional breach as it does to a negligent breach. The overturn in this case was unforeseeable in early 1989, and the District Court had little expectation that in submitting negligence issues to the jury based on our decided cases, she was making an application for reversal.
II.

Opinion Testimony and Ultimate Issues

The rules for the admission of opinion testimony by lay witnesses and by experts were loosened by the adoption of Rule 701-705, Federal Rules of Evidence, and their counterpart found in the Montana Rules of Evidence.
One of the reasons given for the loosening of the Rules as provided in those sections is that the same results could be obtained by posing hypothetical questions to the expert witness, but that method was cumbersome.
The majority stumble in their dissertation on the expert opinion evidence in this case because they do not discern that the questions propounded to the expert were as much ultimate issues of fact as ultimate issues of law. The majority do not dig beneath the ultimate issues of fact to report to the reader the testimony of witness Brown underlying the eventual questions which are set out in the majority opinion and which are really no more than inferences of fact drawn from factual statements earlier testified to by the witness.
The majority opinion has severely delimited the field of opinion testimony formerly permissible by experts. For example, what if in a *47 future case, the lawyer proposes to the highway patrolman: Mr. Patrolman, What in your opinion was the cause of this accident? The cause of an accident may be an ultimate issue of fact, or it may be an ultimate conclusion of law. Under the majority opinion, if the question has the earmarks of an ultimate conclusion of law, the expert cannot testify. Yet clearly, in Montana, under cases all cited by the majority in their opinion, a highway patrolman may give his opinion as to the cause of an accident.
Two of the Rules must be read together to understand their impact and application:
“Rule 702. Testimony by Experts. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.”
“Rule 704. Opinion on Ultimate Issue. Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.”
The true test that should be applied by this Court or any other court in determining the admissibility of opinion evidence by experts is whether that testimony will be helpful to the jury to understand the evidence in determining a fact in issue. If it is so helpful it is admissible.
The rules on opinion evidence by experts are especially applicable to litigation involving issues not ordinarily explored or known to the layman, the average trier of fact or jury. The application of the duty of good faith and fair dealing in the termination of long-term employees is not commonly known or understood. It is a field in which opinion evidence is particularly necessary. In such cases the courts allow the district court’s wide latitude in determining the propriety of the introduction of expert testimony. For example in First National State Bank of New Jersey v. Reliance Electric Company (3rd Cir. 1981), 668 F.2d 725, the court approved testimony by an expert on the Uniform Commercial Code, who testified to trade usage which showed that the plaintiff had failed to take an assignment in good faith, thereby negating his claim as a holder in due course. Whether the plaintiff was a holder in due course was the ultimate issue of fact to be decided by the jury, but it is also an issue of law. Nevertheless *48 the circuit court held that the purpose of the testimony was to aid the jury in its understanding of banking customs and affirmed.
In Brandt v. French (10th Cir. 1981), 638 F.2d 209, the court held that it was permissible for experts to suggest the inferences to be drawn from specialized knowledge of the facts, especially where the weight and credit to be given to the expert testimony was given to the jury through the court’s instruction. In Young v. Illinois Central Gulf Railroad Company (5th Cir. 1980), 618 F.2d 332, where the expert would have testified, following a film demonstration, to the dangerous condition of the railroad crossing in question, the court held that the evidence should have been admitted for the purpose for which it was offered, to demonstrate an 'ultimate issue in the case.
In Bieghler v. Kleppe (9th Cir. 1980), 633 F.2d 531, the Ninth Circuit Court reversed a summary judgment where the plaintiff had offered an affidavit affirmatively showing the expert’s qualifications as an expert in accident reconstruction, the study he had undertaken to form his opinion which was more than a bare conclusion that the defendants had been negligent, and that their negligence had caused the accident. What the majority opinion misses in our case, and does not report to the reader, is the underlying testimony which shows that Brown’s testimony was more than barely legal conclusions.
The majority cite Owen v. Kerr-McGee Corporation (5th Cir. 1983), 698 F.2d 236. There the circuit court held that a question directed to the expert as to the “cause of the accident,” without basis, was asking for a legal conclusion. However in the same case, the court approved a question in which the expert was allowed to testify as to whether defendants were following “safe practices,” itself a legal conclusion, but also an issue of fact.
The decision in Owen v. Kerr-McGee Corporation points up what I regard as a silly syllogism posed by McCormick (cited by the majority at page 957). McCormick states that the question “Did T have capacity to make a will?” would be excluded, while the question, “Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?”, would be allowed. It seems obvious to me that the first question would directly assist the trier of fact while the second question would only confuse the average member of a jury. Indeed, Dean Ladd, in his article, also cited by the majority, in a wry comment on the McCormick posers, opined that very probably a jury could discern the difference even on the first question and *49 as triers of fact would give whatever weight the testimony was entitled to receive. Ladd, Expert Testimony 5 Vanderbilt Law Review 414, 424, (1952).
With that background, let us examine the questions posed to the expert Brown which the majority find offensive, by looking at the underlying testimony. Whether Modern Machinery conducted a legitimate reduction in force in firing Heltborg was an issue of fact. Brown testified, as the majority opinion reflects, his opinion that they did not have “a legitimate reduction in force.” Underlying that opinion, however, was a substantial basis of factual testimony based on his expertise:
“Q. Now, I was going to ask you if you could tell the Jury what those commonly used methods are for conducting a legitimate reduction in force?
“(Objection overruled.)
“Q. Do you remember my question?
“A. Repeat it, please.
“Q. I don’t know if I can. I want you to tell the jury, if you would, what the commonly used methods are to conduct a legitimate reduction in force based upon your education, training, and experience in this field.
“A. All right. I guess I have to preface my remarks with a statement that says before you make a reduction in force a well-managed company has looked at all other options they have available to them.
“(Objection overruled.)
“Q. I will ask you to assume that a company has considered other options, and they have reached a decision that there is no other reasonable or viable option to continue in business, and the only choice is to conduct a reduction in force. So, assume that is the fact.
“A. Okay.
“Q. And assume that has already been done. Now, what are the steps that are commonly followed?
“A. Okay. The first thing that companies normally do when they reach, they feel the only option they have available is to reduce the number of employees they have, is to look at the on-going functions that they are still going to perform as a company. Companies may have decided that they are going to eliminate a product line, eliminate a particular service, they are going to eliminate making a particular product, if they are in the manufacturing business. Or, they may be faced with a situation where their business is slow and they are going *50 to try to continue to do everything they were doing before but they don’t have full-time jobs performing these various functions.
“Q. What is the purpose of looking at the function that is going to continue after the reduction as far as that actually relates to the plant to reduce the force?
“A. Well, before you can plan appropriately on who should be eliminated from your organization, you first have to know what your organization is going to do, what kind of business you are going to be in, and what the functions you are going to perform are going to be. You don’t want to get rid of the only people that can satisfactorily perform functions for you based on some other criteria. You need to know and have a plan what your business is going to be after the reduction in force.
“Q. After considering function which remains, what would the next step that is commonly used be?
“A. Then you look at the people that you have in your organization. And you determine what position that person is in and is that position going to be there after the reduction in force. So you can identify the people whose jobs are going to be affected by your planned change in your business by your reduction in force.
“Q. If the job remains, how does that affect the employee who is actually doing the job?
“A. Well, if the job remains, obviously the employee that is doing the job would remain.
“Q. The next commonly accepted step would be what?
“A. Okay. Now you have identified the people that are affected by the reduction in force. These are the people whose jobs don’t exist any more and that you don’t have a place for performing the same types of functions they have done prior to your reduction in force. So once you have identified these people, then you have to determine what to do with those people. And the generally accepted practice is to attempt to place those employees elsewhere in your organization, put them in some job that they have the skill and the ability to perform, assuming that they are one of your senior employees. You try to take care of your senior employees utilizing their skills they already possess or that they can develop with a minimum amount of training and allow them to take somebody else’s job in your organization so that ultimately a junior person in your organization wherever possible is a person who is ultimately displaced.
*51 “Q. Is there another step after you go through that until you get to the displacement?
“A. Where, there is probably a step that you take concurrent with all of this, or, at least, most organizations do. And that is to look for people who want to volunteer to leave your organization. You know, you may need to get rid of ten people in your organization, and you may have 15 people that would dearly love to go if they got some kind of an incentive to go ....
“Q. You get volunteers as opposed to the person who was involuntarily asked to leave?
“A. That is correct.
“Q. Now, assume that you get through all of these steps, and that all of them have occurred, and you still, you don’t have any volunteers, assuming that that has been offered as an option, and there is no severance package. What about the person who is left and who you have to say: T am sorry, but your job is no longer available. We have decided after a review that you have to be terminated.’ Are there commonly accepted ways of dealing with that employee and the situation that he is in?
“A. Yes, there are.
“Q. What are those things?
“A. The first thing, of course, is to give that employee as much notice as possible so that the employee has an opportunity to try to plan and control his life .... Because, after all, if you selected the person in the first place, you have invested time, effort, and money in his training. And, presumably, he has been a good employee and you don’t want to just throw him out or lose him if you have some place in your organization where he can be productive and held your
“Q. Does that include subsidiaries in terms of looking for available work?
“A. Absolutely.
“Q. Do you have an opinion in this case as to whether or not Modern Machinery was negligent in carrying out the so-called reduction in force that involved Chris Heltborg and one other long-time employee?
“A. Yes, I have an opinion.
“Q. What is your opinion?
“(Objection overruled)
“A. My opinion is that they were, in fact, negligent.
“Q. And what is the basis of that opinion?
*52 “A. Well, I find no evidence that they looked for any other alternatives. I find no evidence other than to have a curtailment, I find no evidence that they analyzed their work force, their on-going job functions to determine what, if in fact, they were going to have to do, whose jobs actually remained after the reduction in force. I find no evidence that indicates that they made any, gave any consideration to seniority, longevity. The only consideration that I find they gave is to who was paid the most” (Emphasis added.)
For each question that was asked of the witness Brown that is set out in the majority opinion, we could pull from the record the underlying testimony that would demonstrate, as demonstrated foregoing, that this witness gave detailed, explicit bases for his opinions and that each of those questions related to an opinion on an issue of fact.
Now I pose to the reader if it is not true that in the discussion of witness Brown underlying his testimony, he was stating elements of fact relating to commonly accepted practices in reductions in force, and proper methods of treating employees who were entitled to the benefit of the obligation of good faith and fair dealing. There was enough in the record to give the jury a basis for determining his credibility, and the weight to be given his evidence, and his opinion on the ultimate issue would be weighed by the jury in the light of the underlying testimony.
Witness Brown testified to the recognized procedures that an employer should follow before terminating a long-term employee entitled to the protection of the implied duty placed on employers for good faith and fair dealing in the termination. Whether or not the employer conformed to those recognized procedures and exercised good faith and fair dealing was always a factual question, and the opinion testimony of Brown reflected no more than ultimate inferences based on his underlying testimony of facts.
The expert should always be permitted to draw inferences for which the jury would not be competent to draw especially when the prejudicial impact of the opinion testimony did not outweigh its probative value to the trier of fact. United States v. Milton (5th Cir. 1977), 555 F.2d 1198. Rule 704 expressly permits testimony in the form of “an opinion or inference.”
Brown’s testimony as an expert met the true test for expert testimony set out in McGuire v. Nelson (1975), 167 Mont. 188, 200, 536 P.2d 768, 775:
*53 “The true test would seem to be whether the subject is sufficiently complex so as to be susceptible to opinion evidence, and whether the witness is properly qualified to give his opinion. Here, there is no doubt that the relationship of the suspension system of the front wheel of a CT200 99 c.c. Honda trail bike to its tire size would not be common knowledge to members of the jury, but a question of mechanical engineering. Also, there is no doubt that Prussing is well qualified to testify on the matter. In view of the fact that the jury can either reject or accept the expert witness’ opinion or give limited weight to it, we fail to see how the admission of the evidence here could constitute a usurpation of the jury’s function.”
The jury after all is the final arbiter, even of the expert’s opinion. That facet of this case has been lost to the majority.
III.

Latitude for Business Decisions versus the Duty of Good Faith and Fair Dealing

We have pointed out above, without setting forth the instructions in full, that the District Court carefully instructed the jury on the essentials pertaining to the covenant of good faith and fair dealing in employment cases based upon the prior decisions of this Court.
The majority opinion is rife with statements in retroflexion of the principles announced by this Court in earlier cases. We find such sentences as “We agree with Modern that these instructions placed the jury in the middle of general management decisions, in effect eviscerating the concept of employer latitude in decision-making.” (At 961.) Again, “There is no justification for giving a jury the authority to review whether reasonable care was utilized in a reduction in force based on economic conditions.” (At 961.) Then there is the improbable statement that ‘We conclude that the employer is not under a duty to use reasonable care in decision-making.” (At 961.)
How far the majority bend backwards in the majority opinion from our earlier positions of law on this subject is demonstrated in this paragraph from Dare v. Montana Petroleum Marketing Company (Weber, J.) (1984), 212 Mont. 274, 282, 687 P.2d 1015, 1020:
“Whether a covenant of good faith dealing is implied in a particular case depends upon objective manifestations by the employer giving rise to the employee’s reasonable belief that he or she has job security and will be treated fairly. Gates, 638 P.2d at 1067, 39 St.Rep. at 20. The presence of such facts indicates that the term of employment has gone beyond the indefinite period contemplated in the at will employ *54 ment statute, § 39-2-503, MCA, and is founded upon some more secure and objective basis. In such cases, the implied covenant protects the investment of the employee who in good faith accepts and maintains employment reasonably believing their job is secure so long as they perform their duties satisfactorily. Such an employee is protected from bad faith or unfair treatment by the employer to which the employee may be subject due to the inherent inequality of bargaining power present in many employment relationships. The implied covenant seeks to strike a balance between the interests of the employer in controlling the workforce and the interests of the employee in job security. Gates, 638 P.2d at 1066-67, 39 St.Rep. at 20.
In Kerr v. Gibson’s Products Company of Bozeman (1987), 226 Mont. 69, 733 P.2d 1292, this Court permitted the review of a discharge during a reduction in force. There, the evidence indicated that the employer had an ulterior motive in discharging the employee. In this case, the jury found, as the District Court noted when it denied the post-trial motion, that the motive of Modern Machinery in discharging Heltborg was not legitimately for a reduction in force but to get rid of a highly paid, long-term employee. Under the concepts of fairness and justice that are the rock-based foundation of the covenant of good faith and fair dealing, an employer forced to reduce its work force because of economic conditions is not thereby absolved of the duty of good faith. Perhaps it is increased, because when forced lay-offs occur, the reduction should take place in accordance with the procedures outlined by Mr. Brown: proper notice, possible severance pay, assignments to other positions in the company or affiliated companies (Modern Machinery is one of many subsidiaries), or severance pay. Here, Modern Machinery failed completely to consider any of these options. It cold-bloodedly terminated a 22-year employee without so much as a thank-you. To say that the jury decision in this case eviscerated the latitude of the employer in decision-making is empty rhetoric; what has been disemboweled here are fairly established concepts of the duty of good faith and fair dealing on an employer forced to a reduction in force.
The majority opinion is a return to the outmoded theory that long-term employment may be terminated without cause. We condemned that in Nye v. Department of Livestock (1982), 196 Mont. 222, 228, 639 P.2d 498, 502, saying:
“[T]he tort of wrongful discharge may apply to an at-will employment situation. In fact, the theory of wrongful discharge has devel *55 oped in response to the harshness of the application of the at-will doctrine, under which an employment may be terminated without cause... The determination of whether the cause of action arises rests upon whether an unfair or unjustified termination was in violation of public policy.” (Citing authority.)
It was in Dare, above cited, that we moved away from requiring a finding of public policy, instead stating that implication of the covenant depended upon existence of “objective manifestations by the employer giving rise to the employee’s reasonable belief that he or she has job security and will be treated fairly.” Dare, 687 P.2d at 1020.
Not only had Modem Machinery acquired key-man insurance on Heltborg as employee, but six months prior to his summary discharge, he had turned down an employment opportunity with another concern because he felt his employment at Modem Machinery was more secure. Modem Machinery’s previous treatment of him and their attitude toward him gave rise as objective manifestations to his feeling of job security.
IV.

Elimination of Punitive Damages for Intentional Breaches of the Covenant

The majority opinion now holds that the breach of the implied covenant of good faith and fair dealing in employment cases is not a tort, but a breach of contract. This has an unanticipated side effect, serendipitous for employers that now even intentional breaches will not merit punitive damages.
Remedies for the breach of the implied covenant of good faith and fair dealing in employment cases now seem to have been statutorily subsumed in the Wrongful Discharge From Employment Act, § 39-2-901, et seq., MCA. At least it can be said for the Act that the remedies provided by the legislature for wrongful discharge are more generous than are those of the majority of this Court, since the Act includes punitive damages. Section 39-2-905, MCA.
V.

Conclusion

I dissent from the majority opinion in all particulars and would affirm the judgment of the District Court.
JUSTICES HARRISON and HUNT join in the foregoing dissent of JUSTICE SHEEHY.