No. 89-341

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

OLIVE M. HELTBORG, as Personal Representative
of the Estate of Otto Christian Heltborg,

Plaintiff and Respondent,

-v-

MODERN MACHINERY, f/k/a ALLIED EQUIPMENT,
f/k/a INDUSTRIAL EQUIPMENT,

Defendant and Appellant.

FILED

JUL 1 0 1990

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

James D. Walen; Keefer, Roybal, Hanson, Staey &
Walen, Billings, Montana
Ronald B. MacDonald, argued; Datsopoulos, MacDonald
& Lind, Missoula, Montana
William T. Murphy, Washington Corporations,
Missoula, Montana

For Respondent:

Donald W. Molloy, argued; Anderson, Edwards &
Molloy, Billings, Montana

Submitted: April 12, 1990

Decided: July 10, 1990

Filed:

_____
Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

This appeal arises from a verdict following a jury trial in the Thirteenth Judicial District, Yellowstone County, Montana. The jury returned a verdict for plaintiff, finding that defendant had violated the covenant of good faith and fair dealing in its discharge of Mr. Heltborg. Defendant appeals. We reverse and remand.

The issues are:

1. Did the District Court err in allowing plaintiff's expert witness to render legal conclusions as to the existence and breach of an implied covenant, and as to whether defendant was negligent?

2. Did the District Court err in instructing the jury on the issue of negligence, and in submitting a special verdict form which instructed the jury to consider whether Modern had negligently breached the covenant of good faith and fair dealing?

3. Did the District Court err in excluding Heltborg's written statement to the Social Security Administration that he was incapable of fulfilling the physical and mental requirements of his job?

4. Did the District Court err in denying defendant's motion for a judgment notwithstanding the verdict?

Modern Machinery (Modern) is a heavy equipment dealer based in Missoula, Montana, and is a subsidiary of Washington Corporation. In the late 1970's the Modern stores began

experiencing financial difficulties. These economic problems continued for a period of approximately eight years, resulting in losses to the company in excess of twelve million dollars. During this time several of Modern's stores were closed, including the stores in Phoenix and Tucson, Arizona, Gillette, Wyoming, and Kalispell, Montana.

In 1986 the manager of the Billings, Montana store was informed that he must attempt to make the store profitable. The Billings store had reduced its employees by half in 1981, yet it had lost in excess of $100,000 for each of the years 1983 through 1985. Trial testimony established that in 1986 the store again lost over $100,000 from ongoing operations, and was essentially insolvent or bankrupt for the year 1986.

Mr. Chris Heltborg was employed in the Billings store as a service manager. He originally began working for Modern as a mechanic, but was promoted to service manager. When the business was healthy Mr. Heltborg had supervised up to eighteen mechanics. By 1986 Mr. Heltborg was supervising only three mechanics. Mr. Heltborg had some physical disabilities, including diabetes, and congestive heart failure. He had also suffered a stroke in 1985.

On April 30, 1986, Mr. Heltborg's employment with Modern was terminated. At 9:00 a.m., Mr. Heltborg and another long-term employee, Darrell Imhoff, were called into the office of Jerry Gibson, the store manager. Mr. Gibson simply informed them that they were terminated. Mr. Heltborg received no prior notice of this and no severance pay. At the time of the termination, Mr.

Heltborg had been employed by Modern for twenty-two years.

Modern did not rehire anyone to fill Mr. Heltborg's position. Mr. Gibson testified that a mechanic, Paddy Gwin, who had been employed by Modern for twenty-seven years, became the "working foreman." Mr. Gwin and two other employees assumed Mr. Heltborg's work.

Four months after his termination, Mr. Heltborg and his wife were asphyxiated in their home due to a defective fireplace door. Mrs. Heltborg survived. Mr. Heltborg died after being hospitalized. Mrs. Heltborg, as representative of her husband's estate, brought suit against Modern, alleging breach of the implied covenant of good faith and fair dealing, negligence in the termination decision, and wrongful discharge. Upon Mr. Heltborg's termination, insurance coverage, including hospitalization insurance and $50,000 of life insurance coverage, had ended. Thus Mrs. Heltborg requested damages for lost wages, medical bills, and for the terminated life insurance coverage.

The District Court dismissed the wrongful discharge claim on Modern's motion for summary judgment. The remaining claims were tried before a jury, which returned a verdict for plaintiff on the breach of the implied covenant of good faith and fair dealing. The jury awarded damages in the amount of $170,608. Following trial, Modern moved for judgment notwithstanding the verdict, and for a new trial. Both motions were denied. Modern appeals.

Did the District Court err in allowing plaintiff's expert witness to render legal conclusions as to the existence and breach of an implied covenant, and as to whether defendant was negligent?

At trial, plaintiff presented an expert witness, Mr. Alan Brown, an expert in employment relations, to testify that defendant was negligent in its reduction in force, that the reduction in force was not legitimate, and that defendant breached an implied covenant of good faith and fair dealing.

On direct examination, plaintiff's counsel established Mr. Brown's training and qualifications and knowledge of the facts surrounding Mr. Heltborg's termination. Mr. Brown's testimony stated commonly accepted methods of conducting a legitimate reduction in force and commonly accepted methods of terminating an employee. Counsel then elicited the following testimony from Mr. Brown:

> Q. Now, I would like to summarize, Mr. Brown. Given the facts and the testimony that you have reviewed in this case, is it your opinion that Modern Machinery conducted a legitimate reduction in force when it fired two high paid long-time employees?
>
> A. It is my opinion that they did not have a legitimate reduction in force.
>
> Q. Based on your investigation and reading, as well as your education and experience, do you have an opinion as to whether or not Modern Machinery had sufficient reliable facts upon which they could reasonably reach the decision to terminate Chris Heltborg?
>
> A. I have an opinion.

Q. What is it?

A. That they did not.

Q. Assuming that there was, in fact, an implied obligation of good faith and fair dealing between the Defendant and Chris Heltborg, do you have an opinion as to whether or not Modern Machinery complied with that obligation?

A. I have an opinion.

Q. What is it?

A. They did not.

Q. Do you have an opinion as to whether or not Modern Machinery violated the standard of care of a reasonably prudent employer and what they would follow regarding a legitimate right of the employee of 22 years service?

A. Yes, I have an opinion.

Q. What is that?

A. They didn't exercise reasonable care.

Q. Was Modern Machinery, in your opinion, negligent in the manner in which they terminated Chris Heltborg?

A. Yes. My opinion is they were.

Q. Do you have an opinion as to whether or not the breach of these obligations was the cause of the loss of Chris Heltborg's employment and his associated benefits of employment, including insurance?

A. Yes. It is my feeling that this is a direct cause of his loss of these benefits.

MR. MOLLOY: Your Honor, I have no more questions.

Similar responses were elicited from Mr. Brown at other intervals in his testimony. Defendant contends that this testimony invaded the province of the jury, in effect

instructing the jury how to decide the case. Defendant also contends this testimony exceeds the scope of expert testimony previously approved by this Court.

In our analysis of this issue we begin by noting relevant Montana Rules of Evidence, which provide:

> Rule 702. Testimony by experts.
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

> Rule 704. Opinions on ultimate issue.
> Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

The Commission Comments to Rule 704, M.R.Evid., state that "the Commission intends this rule to follow the existing Montana practice of not allowing the witness to give a legal conclusion or to apply the law to the facts in his answer."

Montana's Rule 704 is identical to Federal Rule 704. The Advisory Committee Note to the federal rule states:

Advisory Committee's Note

> The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called "ultimate issue" rule is specifically abolished by the instant rule.
>
> . . .
>
> The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions.

testimony by an expert witness in regard to whether certain false statements would have "the capacity to influence" a loan officer. In reversing this ruling the appellate court concluded that this constituted an opinion on a factual issue rather than the legal question of whether statements were material, and was therefore admissible. Lueben, 812 F.2d at 184.

We adopt the above-quoted reasoning of the Fifth Circuit on this issue, although we recognize that on rehearing the Fifth Circuit vacated this portion of the opinion by concluding that the materiality of the false statements was a legal question for the court to decide. Lueben, 816 F.2d at 1033.

This distinction between testimony which constitutes a legal conclusion and that which is a factual conclusion has been decisive in court decisions ruling on the scope of expert testimony. See e.g., Specht v. Jensen (10th Cir. 1988), 853 F.2d 805, cert denied, ___ U.S. ___, 109 S.Ct. 792, 102 L.Ed.2d 783 (1989) (opinion by expert attorney on whether defendants' conduct involved a "search" within the meaning of the Fourth Amendment was a legal conclusion and should not have been allowed); Owen v. Kerr-McGee Corp. (5th Cir. 1983), 698 F.2d 236 (opinion by expert as to legal cause of accident was properly disallowed); Marx & Co., Inc. v. Diners' Club, Inc. (2nd Cir. 1977), 550 F.2d 505, cert denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977)

9

(trial court erred in allowing attorney expert to give legal opinion construing contract terms at issue).

Clearly an expert may testify to an ultimate issue of fact and we have previously so held. See, e.g., Scofield v. Estate of Wood (1984), 211 Mont. 59, 683 P.2d 1300 (court properly allowed highway patrolman to testify as to cause of accident); Wollaston v. Burlington Northern, Inc. (1980), 188 Mont. 192, 612 P.2d 1277 (court properly allowed highway patrolman to testify as to cause of accident); State v. Petko (1978), 177 Mont. 229, 581 P.2d 425 (court properly allowed expert to testify that substance was marijuana even though this was an ultimate factual issue). We emphasize, however, that there is a distinction between testimony on the ultimate factual issue, and testimony on the ultimate legal issue.

To clarify, had Modern provided its employees with a handbook or policy requiring advance notice before a termination, and requiring severance pay, an expert could testify to factual issues of whether the employer followed its own policies. Nonetheless, the expert could not follow this testimony with a legal conclusion on whether the employer violated the covenant of good faith and fair dealing.

This Court limited the scope of expert testimony in Hart-Anderson v. Hauck (1988), 230 Mont. 63, 748 P.2d 937, decided in January 1988, which was over a year before the

> Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed. McCormick § 12.

Rules of Evidence (1972), 56 F.R.D. 183, 284-5.

The Fifth Circuit in U.S. v. Lueben (5th Cir. 1987), 812 F.2d 179, aff'd on rehearing, 816 F.2d 1032 (1987), recently explained this illustration as follows:

> The two questions quoted above illustrate the major surviving exception to the rule that expert opinions on an ultimate issue are admissible: an expert may not express an opinion on a conclusion of law. This court used this exception to uphold the exclusion of the expert testimony in the two cases relied upon by the district court in excluding the expert testimony in this case. In Matthews v. Ashland Chemicals, Inc., this court stated that the expert's answer to the hypothetical question posed in that case would simply tell the jury what result to reach and would allow the expert to voice a legal conclusion as to the proximate cause of the injuries suffered by the plaintiff in that case. See 770 F.2d at 1311. Similarly, in Owen v. Kerr-McGee Corp., this court upheld the exclusion of expert testimony as to the legal cause of an accident. See 698 F.2d at 240.

Lueben, 812 F.2d at 184.

Lueben was accused of making materially false statements to a savings and loan institution, in violation of 18 U.S.C. §§ 1001 and 1014. The trial court disallowed

8

present case went to trial. In Hart-Anderson a Billings attorney testified that defendant was 100% negligent, and that plaintiff was not negligent. He further testified that the insurance agents had violated three specific subsections of the Unfair Claims Settlement Practices Act in their handling of plaintiff's claim. On appeal the plaintiff challenged the propriety of the testimony. The Hart-Anderson analysis quoted approvingly from Marx, as follows:

> [S]uch testimony "amounts to no more than an expression of the [witness'] general belief as to how the case should be decided." McCormick on Evidence, § 12 at 26-27. The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case. McCormick on Evidence, § 12 at 27. It is for the jury to evaluate the facts in the light of the applicable rules of law, and it is therefore erroneous for a witness to state his opinion on the law of the forum. (Citation omitted.)

The court further cautioned that,

> [W]e must be especially careful not to allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law.

Hart-Anderson, 748 P.2d at 942-43.

This Court reversed and remanded, concluding that the repeated legal conclusions simply instructed the jury how to decide the case and were highly prejudicial. The present case is directly comparable to Hart-Anderson. In the present case, just as in Hart-Anderson, there was an

11

extended series of questions on the basic legal issues to be determined by the jury.

The testimony by Mr. Alan Brown constituted a legal conclusion on the precise issue presented to the jury, that is, whether defendant had breached the covenant of good faith and fair dealing. Moreover, he was allowed to state his opinion that defendant was negligent in carrying out its reduction in force and that such reduction was not legitimate; that defendant violated the standard of care of a reasonably prudent employer; that defendant was negligent in its termination of Heltborg; and that breach of these obligations was a direct cause of Mr. Heltborg's loss of benefits. Mr. Brown's testimony was extensive, and he repeatedly stated legal conclusions which amounted to instructing the jury on how to decide the case.

We recently addressed the scope of expert opinion in Mahan v. Farmer's Union Central Exchange, Inc. (Mont. 1989), 768 P.2d 850, 46 St. Rep. 96. Mahan involved charges of age discrimination and breach of the implied covenant of good faith and fair dealing. Mr. Mahan was discharged from Farmers Union Central Exchange, Inc. when he was sixty years old. The expert witness in Mahan, the same Alan Brown as in the present case, was allowed to testify as to whether the company complied with or violated its own policies, in accord with our previous decisions of Crenshaw v. Bozeman Deaconess Hospital (1984), 213 Mont. 488, 693 P.2d 487, and

Flanigan v. Prudential Federal Savings & Loan (1986), 221 Mont. 419, 720 P.2d 257.

However, in Mahan we also discussed the propriety of expert testimony by an expert statistician. In remanding the case, we stated:

> In any event, we affirm the position of the District Court that on retrial the statisticians may testify that their statistical tests show or do not show patterns of discrimination based on age, but may not testify to the ultimate conclusion that age discrimination in his termination was or was not exercised against Wayne Mahan in this case. The jury should be the final arbiter of that issue. Rule 704, M.R.Evid. (Emphasis supplied.)

Mahan, 768 P.2d at 857.

We hold that in the present case the trial court committed reversible error in allowing Mr. Brown to state legal conclusions on the very issues to be decided by the jury. We thus reverse and remand to District Court for new trial.

Appellant raises other alleged errors which we will address for the court's guidance on retrial.

II

Did the District Court err in instructing the jury on the issue of negligence, and in submitting a special verdict form which instructed the jury to consider whether Modern had negligently breached the covenant of good faith and fair dealing?

At trial and on appeal Modern has raised issues

13

involving the application of a negligence theory to an employment termination. As previously noted, plaintiff's complaint alleged a breach of the covenant of good faith and fair dealing in Count I, negligence in Count II, and wrongful discharge in Count III.

Under Count II, plaintiff's complaint alleged that Modern was negligent in failing to exercise ordinary and reasonable care in investigating the need to terminate Mr. Heltborg. In its answer, Modern asserted the affirmative defense to this allegation that it had employed a legitimate reduction in force as a result of economic conditions.

Modern moved for summary judgment on all three counts listed in the complaint. In its brief in support of summary judgment, Modern contended that negligence in the employment context is only actionable in conjunction with a breach of the covenant. Moreover, the pretrial order listed as an issue of law whether Montana recognizes a separate and distinct tort of negligence as opposed to negligently violating the covenant of good faith and fair dealing.

At trial Modern objected to the following jury instructions which were given by the court:

Instruction No. 18:

> When the legal duty to act in good faith exists in the employment relationship, as it does in this case, then there is a duty imposed upon the employer to exercise reasonable care in carrying out decisions concerning employment. This means that there is a duty on the part of the employer to use reasonable care under the circumstances in carrying out its business decision-making.

14

Instruction No. 19:

> A reduction in force can constitute a just cause for termination of employment. However, you are instructed that the employer's right to reduce its personnel does not excuse its obligation to act fairly and in good faith or to use ordinary and reasonable care in the process and manner of termination of employment.

Modern offered the following instructions, which were refused:

Instruction No. 28:

> An employer who acts in good faith on an honest but mistaken belief that the discharge of an employee was warranted by a legitimate business reason has not committed a breach of the covenant of good faith and fair dealing.

Instruction No. 26:

> In determining whether Modern . . . negligently terminated . . . employment, you are not to consider whether Modern Machinery made a correct decision or a good management decision. Modern Machinery has the absolute authority to make managerial decisions relating to the termination of employees to maintain the economic vitality of its company, regardless if those managerial decisions are good decisions or poor decisions.

Modern contends that the given instructions militate against previously stated policies that an employer must have "wide latitude in deciding whom it will employ," Gates v. Life of Montana (1982), 196 Mont. 178, 184, 638 P.2d 1063, 1067, and that an employer may engage in "legitimate reductions in force necessary to maintain the economic vitality of the company," Flanigan, 720 P.2d at 261. Modern contends that there is no duty to use reasonable care in the process and manner of termination. Additionally, Modern contends that imposing a duty of reasonable care upon Modern in its decision making suffers from the lack of

15

any definable standard of care.

Modern contends that an employer should not be liable for negligence in making business decisions, including reduction in force decisions. It contends this would be an extension of negligence liability in the employment context. It contends this Court has previously affirmed a finding of negligence by an employer in only two instances: 1) where the employer violates its own written termination policies, as in Flanigan, and 2) where an employer fails to investigate allegations of misconduct before terminating an employee for cause, as in Crenshaw.

This Court first allowed a negligence cause of action in an employment termination case in Crenshaw. In Crenshaw we concluded that the trial court did not err in giving a jury instruction defining negligence. Crenshaw involved allegations that the employer was negligent in not following its own employee handbook policies, and in not properly investigating charges against the employee. These failures were in conjunction with several acts by the employer which were characterized as acts of "bad faith," such as making false charges against the employee and notifying the local job service of such charges. Crenshaw was later cited for the proposition that negligence forms a proper basis for recovery in an employee termination case. See Flanigan, 720 P.2d at 263; Rupnow v. City of Polson (1988), 234 Mont. 66, 72, 761 P.2d 802, 806; Prout v. Sears, Roebuck & Co. (Mont. 1989), 772 P.2d 288, 291, 46 St.Rep. 257, 261.

In Flanigan, the allegations of negligence were joined

16

with allegations of age discrimination, and ulterior motives on the part of the employer in firing the employee. In both Crenshaw and Flanigan the alleged negligence was in conjunction with allegations properly forming a basis for a breach of the covenant. The negligence issues were not essential in either Crenshaw or Flanigan.

In Gates I this Court stated:

> These cases emphasize the necessity of balancing the interests of the employer in controlling his work force with the interests of the employee in job security. In adopting the doctrine of good faith in employment contracts the courts did not seek to infringe upon the interests of the employer, but recognized that:
>
>> ". . . an employer is entitled to be motivated by and to serve its own legitimate business interests; that an employer must have wide latitude in deciding whom it will employ in the face of the uncertainties of the business world; and that an employer needs flexibility in the face of changing circumstances." (Citation omitted.)

Gates, 638 P.2d at 1066-67.

In Flanigan we stated that a long-term employee's expectation of continued employment "does not foreclose an employer from engaging in legitimate reductions in force necessary to maintain the economic vitality of the company." Flanigan, 720 P.2d at 261.

In the present case, the instructions given allowed the jury to decide the legitimacy of a reduction in force and whether it was carried out in a negligent manner. We agree with Modern that these instructions placed the jury in the middle of general management decisions, in effect eviscerating the concept of

17

employer latitude in decision-making.

Moreover, in the present case the expert was allowed to compare Modern's reduction in force to that of other employers in general. The jury was then given the authority to review the adequacy of the employer's management decisions under a broad undefined "reasonable care" standard. This type of decision cannot properly be scrutinized in hindsight for its legitimacy. Neither should negligence be based on the procedures of other employers. There is no justification for giving a jury the authority to review whether reasonable care was utilized in a reduction in force based on economic conditions.

In Kerr v. Gibson's Prod. Co. of Bozeman (1987), 226 Mont. 69, 733 P.2d 1292, this Court affirmed the review of a discharge during a reduction in force; however, the holding in Kerr was premised upon a breach of the covenant, not negligence in the reduction in force. In Kerr the employer had violated employee handbook policies in its termination procedures and in rehiring. Additionally, in Kerr, after discharging several employees, the employer then refilled the positions with lower paid employees. We affirmed the determination that this breached the covenant of good faith and fair dealing. The present case is distinguishable from Kerr to the extent that the present case is premised upon negligence of the employer in implementing a reduction in force. The present case is further distinguishable in that it is undisputed that the Billings Modern store had sustained large losses for several years. Modern made the decision to discharge

18

two long term and highly paid employees based on economics and workloads. The present case does not involve handbook violations; neither was Mr. Heltborg's position refilled.

This Court has recognized that an employer has a duty not to breach the covenant of good faith and fair dealing once the covenant has arisen in the employment relationship. Gates. This duty has been stated as a duty not to discharge for an improper reason, Crenshaw, 693 P.2d at 492. The breach of this duty considers the intentional conduct of an employer. We have not imposed upon the employer a duty to use reasonable care in decision-making, based upon a theory of negligence.

We conclude that the employer is not under a duty to use reasonable care in decision-making. Therefore, in the present case, the management decision to implement a reduction in force for economic reasons is not susceptible to a negligence analysis by a jury. We conclude that Jury Instruction Nos. 18 and 19 were incorrect and should not be used on retrial.

On appeal Modern also objects to the special verdict form which directed the jury to consider if Modern had negligently breached the covenant of good faith and fair dealing. The special verdict form submitted to the jury was as follows:

### QUESTION NO. 1

Has the Plaintiff proved, by a preponderance of the evidence, that the Defendant breached the covenant of good faith and fair dealing?

ANSWER:     YES __X__     NO_____

19

## QUESTION NO. 2

Has the Plaintiff proved by a preponderance of the evidence that the Defendant negligently breached the covenant of good faith and fair dealing?

ANSWER:        YES __X__        NO____

If your answers to Questions No. 1 and No. 1 are "No" go to the bottom of the Verdict Form, date and sign it and ask to be returned to Court.

If your answer to either Question No. 1 and No. 2, or both is "Yes" go to Question No. 3.

## QUESTION NO. 3

What damages, if any, do you find were caused to the Plaintiff?

AMOUNT:        $ 170,608.66

Modern contends that it was error to submit to the jury the issue of whether Modern negligently breached the covenant of good faith and fair dealing. It contends that a cause of action only arises where the covenant is willfully breached. Although defendant did not object to this verdict form at trial, we address this issue for retrial.

We conclude that in general a breach of the covenant of good faith and fair dealing does not involve negligent conduct, but intentional conduct. This holding accords with prior Montana cases involving a breach of the covenant of good faith and fair dealing in employment. See Gates (evidence indicated employer failed to follow its own termination policies); Crenshaw (evidence indicated employer acted in bad faith in discharging employee); Flanagan (evidence indicated employer may have had ulterior motive

20

for discharge of employee); and <u>Kerr</u> (evidence indicated employer had ulterior motive in discharging employee). It also accords with the holdings of other jurisdictions in cases involving a breach of the covenant in an employment relationship. <u>See</u> Pugh v. See's Candies, Inc. (Cal.App.3d 1988), 250 Cal.Rptr. 195, 213 ("Even an honest, though mistaken, belief that the employer for legitimate business reasons had good cause for the discharge would negate bad faith"). Although previous Montana employment termination cases have discussed employer negligence, no case has allowed a <u>negligent</u> breach of the covenant.

We conclude that the verdict form improperly commingled the concepts of negligence and a breach of the covenant of good faith and fair dealing and should not be used on retrial.

### III

Did the District Court err in excluding Heltborg's written statement to the Social Security Administration that he was incapable of fulfilling the physical and mental requirements of his job?

Mr. Heltborg applied for Social Security disability benefits after his termination. These benefits were denied. In his appeal to the Social Security Administration, Mr. Heltborg wrote a letter explaining his physical disabilities. A relevant portion of the letter stated:

Although the men at the shop would help me with my

21

work, it was becoming more apparent that my disability was making it impossible to fulfill the physical and mental requirements of my job as Service Manager. Finally, the Managers of Modern Machinery realized that this was the case and I was dismissed from my job of 22 years. I feel that it would be impossible for me to go to work as either a mechanic or Service Manager as I would be unable to perform the job duties and there would be no way that I could be helped with my insulin reactions if I were working for other companies.

Defendants attempted to have this document admitted at trial; however, the court granted the plaintiff's motion in limine, excluding the document.

Defendant contends that Mr. Heltborg's ability to perform physical labor was a major issue at trial since plaintiff contended Mr. Heltborg should have been offered the option of taking a mechanic's job. Defendant contends that this document was relevant to defendant's assertion that Mr. Heltborg's physical condition prevented him from working as a mechanic.

To be admissible at trial, evidence must be relevant, as defined in Rule 401, M.R.Evid. At trial plaintiff elicited testimony from Mr. Alan Brown and Mrs. Heltborg that Modern should have offered Mr. Heltborg work as a mechanic both before and after termination. Plaintiff presented this same allegation to the jury through its examination of defense witnesses. The admissions by Mr. Heltborg in his letter were certainly relevant to rebut this theory.

The letter was also competent evidence. Although the

letter had definite hearsay qualities (i.e., the statements by Mr. Heltborg were out of court statements and were offered for the truth of the matter asserted. Rule 801(c), M.R.Evid.), the statements were admissions of a party opponent and therefore fall within Rule 801(d)(2), M.R.Evid., an exclusion to the hearsay rule. See McCormick on Evidence § 263 (3rd Ed. 1984); 4 Wigmore, Evidence § 1048 (Chadbourn Rev. 1972) ("The statements made out of court by a party opponent are universally deemed admissible, when offered against him."); Kekua v. Kaiser Found. Hosp. (Haw. 1979), 601 P.2d 364, 370 (explaining the difference between an admission of party opponent which is excluded from the hearsay rule and a statement against interest which is an exception to the rules).

We conclude that this letter was properly admissible under the evidentiary rules.


IV

Did the District Court err in denying defendant's motion for a judgment notwithstanding the verdict?

Following trial, Modern moved for judgment notwithstanding the verdict on the issues of breach of the covenant and negligence. This motion was denied. On appeal, defendant contends the motion should have been granted, urging there was no evidence to support allegations that the covenant had been breached. Modern also urges that

23

a cause of action for negligence in an employment termination should not be extended to general management decisions in a reduction in force, nor should the manner in which an employee is discharged provide a basis for a negligence cause of action.

Although we agree that in general negligence does not afford a cause of action in a suit involving employment termination, we conclude that there existed issues of fact in regard to whether the covenant of good faith and fair dealing was breached, which were properly submitted for jury determination. We affirm the District Court's denial of the motion for judgment notwithstanding the verdict.

Reversed and remanded.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

_____
District Judge Peter L. Rapkoch
sitting for Justice Diane Barz

Justice John C. Sheehy, dissenting:

This widow, Olive M. Heltborg, now shares the all-too-often experience of plaintiffs whose money damages verdicts are consistently (or better yet, inconsistently) reversed by the majority of this Court: It is like rowing a boat upwind among the ice floes on a wintry afternoon. The judicial climate here is not just frosty, it is freezing.

Take this case. Please.

This lawsuit is not about wrongful discharge from employment. Early in the game, the District Court removed wrongful discharge as an issue by granting summary judgment in favor of the defendant. There has been no appeal from that decision of the District Court. Yet here the majority confuse this case in their opinion as one for wrongful discharge.

The majority opinion overall has these principal effects, all deleterious to formerly accepted principles of law:

(1) Limiting actions for breach of the implied covenant of good faith and fair dealing to _intentional_ breaches, thus eliminating any causes of action for negligent breaches.

(2) Delimiting the scope of expert testimony.

(3) Confusing the latitude of employers to make business decisions with concepts relating to the covenant of good faith and fair dealing.

(4) Preventing punitive damages even for _intentional_ breaches of the covenant.

I.

Negligence and the Covenant of Good Faith and Fair Dealing

The majority do not recognize or seem to know that the source of the implied covenant of good faith and fair dealing in contract relationships is not in the contract terms, but is implied by law. The fundamental error of the majority is their belief that the implied covenant was bargained for by the parties. In this, the majority "adopt" the errant reasoning of the California Supreme Court in Foley v. Interactive Data Corporation (Cal. 1988), 765

25

P.2d 373, and ignore, as did the California Supreme Court, the lucid explanation of the source of the implied covenant furnished by Justice Kaufman in his dissent:

> In attempting to emphasize its contractual origins, the majority characterized the covenant of good faith and fair dealing as a "contract term . . . aimed at making effective the agreement's promises" . . . That characterization is simply incorrect under the decisions of this Court and the authorities on which they rely. It is true that the law implies in every <u>contract</u> a duty of good faith and fair dealing. . . The duty to deal fairly and in good faith with the other party to a contract however "is a <u>duty imposed by law, not one arising from the terms of the contract itself</u>. In other words this duty of dealing fairly and in good faith is nonconsensual in origin rather than consensual" . . . While the nature of the obligations imposed by this duty is dependent upon the nature and purpose of the contract and the expectations of the parties, these obligations are not consensual, not agreed to in the contract; they are <u>imposed by law</u> and thus reflect a normative value of society as a whole . . . The interest which the duty of good faith is designed to preserve and protect is essentially not the <u>parties'</u> interest in having their promises performed, but <u>society's</u> interest in protecting its members from harm on account of nonconsensual conduct . . . (Emphasis in original; citations omitted.)

<u>Foley</u>, 765 P.2d at 412, 413.

When viewed from this context, the duty of good faith and fair dealing implied in contractual relationships is no different from the duty imposed by or found in law in any other relationship. A breach not only harms the party directly involved, but the harm accrues to society as a whole, and affects its stability and peace. The covenant is based on considerations of justice and fair play, applicable to all societal relationships. The covenant rises in contract cases not because the parties agreed to it, but because society as a whole imposes the covenant as a duty, a breach of

26

which is not a breach of contract, but a wrongful act properly treated as a tort, since the wrong inflicts damages on the party wronged and the public fabric as a whole.

In Nicholson v. United Pacific Insurance Company (1985), 219 Mont. 32, 41-42, 710 P.2d 1342, 1348, we described the covenant:

> . . . the nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously or unreasonably, that conduct exceeds the justifiable expectations of the second party. The second party then should be compensated for damages resulting from the other's culpable conduct.

Note that in Nicholson, this Court said that the implied covenant would be breached by a party acting "arbitrarily, capriciously, or unreasonably." When a party acts arbitrarily or capriciously, he is probably acting intentionally. If he is acting unreasonably, he may be acting intentionally, but he may be also acting negligently. It is the public policy of this State that a person acting negligently is also responsible for his acts or omissions if others are harmed thereby. Witness the statute:

> **27-1-701. Liability for negligence as well as willful acts.**
> Except as otherwise provided by law, everyone is responsible not only for the results of his willful acts but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person except so far as the latter has willfully or by want of ordinary care brought the injury upon himself.

No matter how the majority may try to slice it otherwise, it was firmly established in our cases that a negligent breach of the

27

duty of good faith and fair dealing was actionable in this State. In Crenshaw v. Bozeman Deaconess Hospital (1984), 213 Mont. 488, 693 P.2d 487, 493, this Court (Harrison, J.) stated:

> In light of the foregoing, we find the Hospital's conduct showed a "want of attention to the nature or probable consequence of the act or omission" and that their conduct fell below the "standard established by law for the protection of others against unreasonable risk." (Citing authority.) The allegation of negligence was clearly established in respondent's complaint. We hold the trial court committed no error in issuing the instructions to the jury.

In Flanigan v. Prudential Federal Savings and Loan Association (1986), 221 Mont. 419, 720 P.2d 257, 263, this Court (Morrison, J.) said:

> Negligence has been recognized by this Court to be a proper basis for recovery in wrongful termination cases. Negligence was approved by this Court in Crenshaw v. Bozeman Deaconess Hospital (Mont. 1984), 693 P.2d 487, 493, 41 St.Rep. 2251, 2259, . . .

A reasonable belief in job security as a ground for application of the duty of good faith and fair dealing was acknowledged in Kerr v. Gibson's Products Company of Bozeman (1987), 226 Mont. 69, 733 P.2d 1292, 1295 (Turnage, C.J.) where we said:

> The covenant of good faith and fair dealing is implied when objective manifestations by the employer give rise to the employee's reasonable belief that he or she has job security and will be treated fairly. (Citing authority.)
>
> Gibson's repeatedly acknowledged respondent's work as satisfactory through promotions and pay increases. It was reasonable for respondent to believe that she had job security and would be treated fairly.

28

Generally, we can anticipate that most breaches of the duty of good faith and fair dealing will be intentional on the part of the employer. Since it is the policy of the law under our Constitution of Montana (Art. II, Sec. 16) to afford a speedy legal remedy for every injury of person, property or character, no sound legal reason can be advanced, and the majority advance none, why negligent breaches of the duty, which can be just as damaging to the wronged party as an intentional breach, should not find a remedy in our courts.

We turn now to the specifics of this case, and our first observation is that the recitation of facts in the majority opinion slant toward the employer. This occurs because of the belief of the majority that this case involves an attack by Heltborg on the right of the employer to engage in a reduction in force. Nothing of the kind. Heltborg did not contest the right of Modern Machinery to reduce its work force. Rather, he contended that in reducing its work force it acted arbitrarily, negligently and unfairly and thus breached the duty of good faith and fair dealing in the employment contract.

On appeal from a jury verdict, the evidence in the case is viewed in the light most favorable to the prevailing party, and, if the evidence conflicts, credibility of the witnesses and the weighing of the evidence are in the province of the jury and not the Supreme Court. Kukuchka v. Ziemet (1985), 219 Mont. 155, 710 P.2d 1361. This Court reviews evidence in the light most favorable to the party that won in the District Court, because of the

29

presumption on appeal that the determination of the trial court is correct. Kyriss v. State (1985), 218 Mont. 162, 707 P.2d 5.

From the viewpoint of the successful claimant, the facts are better stated thusly: Otto Heltborg worked continuously for Modern Machinery, or its predecessors, for over 22 years. In a brief and shocking meeting, on April 30, 1988, he was summarily fired, without notice, and without any opportunity to continue in his job. At the time he was a Service Manager, a position that was essential to the continued operation of Modern Machinery. The man who fired him admitted this and also admitted that Heltborg's job remained the same after he was fired. It was just Otto Heltborg and his salary that were eliminated. The company carried "key man" insurance on his life.

Heltborg was the highest paid salaried employee of Modern Machinery when he was fired. The decision to fire him was based on his salary. His job was taken over by by people who were being paid less. After Heltborg was fired, his successor employee spent 95 percent of his 8 hour shift for over 2½ years doing the job that Heltborg had previously done. Two other employees also took some of the responsibility Heltborg had, after he was fired. Within weeks after Heltborg was fired, Modern Machinery hired additional employees, turned a profit in that year, and paid its president a handsome bonus.

Modern Machinery presented a hard-nosed defense to justify the the termination of Heltborg. It established through its witnesses and in cross-examination of others that Modern Machinery was losing

$175,000 a year; that no state law requires that notice be given to the employees before they are discharged; that it was not bad faith not to give a long-time employee severance pay; and that Heltborg was an at-will employee.

The District Court discerned the issues of this case early in the proceedings. In denying Modern Machinery's motion for a summary judgment on the breach of covenant count, she said:

> In this case there is a question of material fact, regarding the legitimacy of the reduction in force, that must be resolved by a jury. While defendant argues that defense of economic necessity entitles it to summary judgment as a matter of law, plaintiff argues that the economic necessity and reduction in force defense is not legitimate because plaintiff's husband's job duties continued, but were performed by remaining employees. Plaintiff argues that there was not a reduction in force, but a reduction in salary, and that her husband was fired because he was one of the highest paid employees, not because of lack of work.

It was on that stance that the issues went to the jury. The District Court instructed the jury that the law does not require an employer to adopt or maintain a particular set of personnel policies and procedures, and that there was no rule of law that requires an employer to give preference to longevity, give notice or pay in lieu of notice or severance pay, give employees a right to displace another employee at the time of discharge, give employees any right to be rehired, or require the employer to find other employment for the discharged employee within its own company or elsewhere. On the other hand, the District Court instructed the jury that in this case a duty of good faith and fair dealing had arisen during his employment and existed at the time of his

31

termination. It stated, however, that the covenant of good faith and fair dealing in a long-term relationship did not foreclose the employer from engaging in legitimate reductions in force necessary to maintain the economic vitality of the company, and that in determining whether or not Modern Machinery violated the duty of good faith and fair dealing, the jury had to balance the interest of the defendant in controlling its work force with the interest of the plaintiff in job security. The District Court told the jury that an employer is entitled to be motivated by and to serve its own legitimate business interest, and had to be given discretion in determining whom it would employ and retain in employment.

The District Court then instructed that under the implied obligation of good faith and fair dealing, the nature and extent of the obligation depend on the reasonable expectations of the employee based on the employer's actions. As triers of fact, the jury was told that they had to determine whether the defendant had shown a fair and honest reason for termination, taking into account all of the facts and circumstances in reaching their decision. The court then told the jury that when the legal duty to act in good faith in employment relationships exists, a duty was imposed upon the employer to exercise reasonable care in carrying out decisions concerning employment. The District Court said that this meant that there was a duty on the part of the employer to use reasonable care under the circumstances in carrying out its business decision-making. In this particular, the court relied on Flanigan, 720 P.2d at 263.

32

The court also instructed the jury that the employer's right to reduce its personnel did not excuse its obligation to act fairly and in good faith in the process and manner of termination of employment.

It is clear that the instructions given to the jury by the District Court were proper, and were based upon express decisions from this Court. The majority of this Court have found no error in the instructions given, nor could they. Rather, the majority accomplishes a reversal here by jerking out from established law the concept of negligence, in a retrofit of law pertaining to a breach of the covenant.

Particularly, the District Court avoided the problem raised in Hobbs v. Pacific Hide and Fur Depot (1989), 236 Mont. 503, 771 P.2d 125, where this Court reversed because the instructions "did not tell the jury that the implied covenant is measured in a particular contract by the justifiable expectations of the parties." Of course, the District Court could not have anticipated the about-face taken by the majority in this case.

In denying the post-trial motion of Modern Machinery for judgment notwithstanding the verdict, the District Court pointed out that the arguments made for that motion were the same as for the summary judgment motion and said:

> These factual issues precluded summary judgment and had to be decided by a jury. The jury heard the evidence and found in favor of plaintiff. Obviously, the jury did not believe that defendant had a fair and honest reason to discharge Otto Heltborg or that the reduction in force was legitimate or that the manner in which it was carried out was fair.

33

The jury's verdict was supported by evidence put on by plaintiff that defendant selected the most highly paid employee in the shop for discharge, that his job continued to be done, that his job was essential to the continued economic viability of the company, and that his job was done by a lesser paid employee.

In a way, it is too bad that Heltborg's widow utilized negligent breach as well as purposeful breach in pressing her claim in the District Court, for the evidence points as strongly to an intentional breach as it does to a negligent breach. The overturn in this case was unforeseeable in early 1989, and the District Court had little expectation that in submitting negligence issues to the jury based on our decided cases, she was making an application for reversal.

## II.

## Opinion Testimony and Ultimate Issues

The rules for the admission of opinion testimony by lay witnesses and by experts were loosened by the adoption of Rule 701-705, Federal Rules of Evidence, and their counterpart found in the Montana Rules of Evidence.

One of the reasons given for the loosening of the Rules as provided in those sections is that the same results could be obtained by posing hypothetical questions to the expert witness, but that method was cumbersome.

The majority stumble in their dissertation on the expert opinion evidence in this case because they do not discern that the questions propounded to the expert were as much ultimate issues of fact as ultimate issues of law. The majority do not dig beneath

34

the ultimate issues of fact to report to the reader the testimony of witness Brown underlying the eventual questions which are set out in the majority opinion and which are really no more than inferences of fact drawn from factual statements earlier testified to by the witness.

The majority opinion has severely delimited the field of opinion testimony formerly permissible by experts. For example, what if in a future case, the lawyer proposes to the highway patrolman: Mr. Patrolman, What in your opinion was the cause of this accident? The cause of an accident may be an ultimate issue of fact, or it may be an ultimate conclusion of law. Under the majority opinion, if the question has the earmarks of an ultimate conclusion of law, the expert cannot testify. Yet clearly, in Montana, under cases all cited by the majority in their opinion, a highway patrolman may give his opinion as to the cause of an accident.

Two of the Rules must be read together to understand their impact and application:

> Rule 702. <u>Testimony by Experts</u>. If scientific, technical, or other specialized knowledge <u>will assist the trier of fact</u> to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

> Rule 704. <u>Opinion on Ultimate Issue</u>. Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

The true test that should be applied by this Court or any other court in determining the admissibility of opinion evidence

35

by experts is whether that testimony will be helpful to the jury to understand the evidence in determining a fact in issue. If it is so helpful it is admissible.

The rules on opinion evidence by experts are especially applicable to litigation involving issues not ordinarily explored or known to the layman, the average trier of fact or jury. The application of the duty of good faith and fair dealing in the termination of long-term employees is not commonly known or understood. It is a field in which opinion evidence is particularly necessary. In such cases the courts allow the district court's wide latitude in determining the propriety of the introduction of expert testimony. For example in First National State Bank of New Jersey v. Reliance Electric Company (3rd Cir. 1981), 668 F.2d 725, the court approved testimony by an expert on the Uniform Commercial Code, who testified to trade usage which showed that the plaintiff had failed to take an assignment in good faith, thereby negating his claim as a holder in due course. Whether the plaintiff was a holder in due course was the ultimate issue of fact to be decided by the jury, <u>but it is also an issue of law</u>. Nevertheless the circuit court held that the purpose of the testimony was to aid the jury in its understanding of banking customs and affirmed.

In Brandt v. French (10th Cir. 1981), 638 F.2d 209, the court held that it was permissible for experts to suggest the <u>inferences</u> to be drawn from specialized knowledge of the facts, especially where the weight and credit to be given to the expert testimony was

given to the jury through the court's instruction. In Young v. Illinois Central Gulf Railroad Company (5th Cir. 1980), 618 F.2d 332, where the expert would have testified, following a film demonstration, to the dangerous condition of the railroad crossing in question, the court held that the evidence should have been admitted for the purpose for which it was offered, to demonstrate an ultimate issue in the case.

In Bieghler v. Kleppe (9th Cir. 1980), 633 F.2d 531, the Ninth Circuit Court reversed a summary judgment where the plaintiff had offered an affidavit affirmatively showing the expert's qualifications as an expert in accident reconstruction, the study he had undertaken to form his opinion which was more than a bare conclusion that the defendants had been negligent, and that their negligence had caused the accident. What the majority opinion misses in our case, and does not report to the reader, is the underlying testimony which shows that Brown's testimony was more than barely legal conclusions.

The majority cite Owen v. Kerr-McGee Corporation (5th Cir. 1983), 698 F.2d 236. There the circuit court held that a question directed to the expert as to the "cause of the accident," without basis, was asking for a legal conclusion. However in the same case, the court approved a question in which the expert was allowed to testify as to whether defendants were following "safe practices," itself a legal conclusion, but also an issue of fact.

The decision in Owen v. Kerr-McGee Corporation points up what I regard as a silly syllogism posed by McCormick (cited by the

37

majority at page 7 of the slip opinion). McCormick states that the question "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?", would be allowed. It seems obvious to me that the first question would directly assist the trier of fact while the second question would only confuse the average member of a jury. Indeed, Dean Ladd, in his article, also cited by the majority, in a wry comment on the McCormick posers, opined that very probably a jury could discern the difference even on the first question and as triers of fact would give whatever weight the testimony was entitled to receive. Ladd, Expert Testimony 5 Vanderbilt Law Review 414, 424, (1952).

With that background, let us examine the questions posed to the expert Brown which the majority find offensive, by looking at the underlying testimony. Whether Modern Machinery conducted a legitimate reduction in force in firing Heltborg was an issue of fact. Brown testified, as the majority opinion reflects, his opinion that they did not have "a legitimate reduction in force." Underlying that opinion, however, was a substantial basis of factual testimony based on his expertise:

> Q. Now, I was going to ask you if you could tell the Jury what those commonly used methods are for conducting a legitimate reduction in force?
>
> (Objection overruled.)
>
> Q. Do you remember my question?

A. Repeat it, please.

Q. I don't know if I can. I want you to tell the Jury, if you would, what the commonly used methods are to conduct a legitimate reduction in force based upon your education, training, and experience in this field.

A. All right. I guess I have to preface my remarks with a statement that says before you make a reduction in force a well-managed company has looked at all other options they have available to them.

(Objection overruled.)

Q. I will ask you to assume that a company has considered other options, and they have reached a decision that there is no other reasonable or viable option to continue in business, and the only choice is to conduct a reduction in force. So, assume that is the fact.

A. Okay.

Q. And assume that has already been done. Now, what are the steps that are commonly followed?

A. Okay. The first thing that companies normally do when they reach, they feel the only option they have available is to reduce the number of employees they have, is to look at the on-going functions that they are still going to perform as a company. Companies may have decided that they are going to eliminate a product line, eliminate a particular service, they are going to eliminate making a particular product, if they are in the manufacturing business. Or, they may be faced with a situation where their business is slow and they are going to try to continue to do everything they were doing before but they don't have full-time jobs performing these various functions.

Q. What is the purpose of looking at the function that is going to continue after the reduction as far as that actually relates to the plant to reduce the force?

A. Well, before you can plan appropriately on who should be eliminated from your organization, you first have to know what your organization is going to do, what kind of business you are going to be in, and what the functions you are going to perform are going to be. You don't want to get rid of the only people that can satisfactorily perform functions for you based on some other criteria. You need to know and have a plan what

39

your business is going to be after the reduction in force.

Q. After considering function which remains, what would the next step that is commonly used be?

A. Then you look at the people that you have in your organization. And you determine what position that person is in and is that position going to be there after the reduction in force. So you can identify the people whose jobs are going to be affected by your planned change in your business by your reduction in force.

Q. If the job remains, how does that affect the employee who is actually doing the job?

A. Well, if the job remains, obviously the employee that is doing the job would remain.

Q. The next commonly accepted step would be what?

A. Okay. Now you have identified the people that are affected by the reduction in force. These are the people whose jobs don't exist any more and that you don't have a place for performing the same types of functions they have done prior to your reduction in force. So once you have identified these people, then you have to determine what to do with those people. And the generally accepted practice is to attempt to place those employees elsewhere in your organization, put them in some job that they have the skill and the ability to perform, assuming that they are one of your senior employees. You try to take care of your senior employees utilizing their skills they already possess or that they can develop with a minimum amount of training and allow them to take somebody else's job in your organization so that ultimately a junior person in your organization wherever possible is a person who is ultimately displaced.

Q. Is there another step after you go through that until you get to the displacement?

A. Where, there is probably a step that you take concurrent with all of this, or, at least, most organizations do. And that is to look for people who want to volunteer to leave your organization. You know, you may need to get rid of ten people in your organization, and you may have 15 people that would dearly love to go if they got some kind of an incentive to go. . . .

Q. You get volunteers as opposed to the person who was

involuntarily asked to leave?

A. That is correct.

Q. Now, assume that you get through all of these steps, and that all of them have occurred, and you still, you don't have any volunteers, assuming that that has been offered as an option, and there is no severance package. What about the person who is left and who you have to say: "I am sorry, but your job is no longer available. We have decided after a review that you have to be terminated." Are there commonly accepted ways of dealing with that employee and the situation that he is in? A. Yes, there are.

Q. What are those things?

A. The first thing, of course, is to give that employee as much notice as possible so that the employee has an opportunity to try to plan and control his life. . . . Because, after all, if you selected the person in the first place, you have invested time, effort, and money in his training. And, presumably, he has been a good employee and you don't want to just throw him out or lose him if you have some place in your organization where he can be productive and held your--

Q. Does that include subsidiaries in terms of looking for available work?

A. Absolutely.

Q. Do you have an opinion in this case as to whether or not Modern Machinery was negligent in carrying out the so-called reduction in force that involved Chris Heltborg and one other long-time employee?

A. Yes, I have an opinion.

Q. What is your opinion?

(objection overruled)

A. My opinion is that they were, in fact, negligent.

Q. And what is the basis of that opinion?

A. Well, I find no evidence that they looked for any other alternatives. I find no evidence other than to have a curtailment, I find no evidence that they analyzed their work force, their on-going job functions to determine what, if in fact, they were going to have

41

to do, whose jobs actually remained after the reduction in force. I find no evidence that indicates that they made any, gave any consideration to seniority, longevity. <u>The only consideration that I find they gave is to who was paid the most</u>. (Emphasis added.)

For each question that was asked of the witness Brown that is set out in the majority opinion, we could pull from the record the underlying testimony that would demonstrate, as demonstrated foregoing, that this witness gave detailed, explicit bases for his opinions and that each of those questions related to an opinion on an issue of fact.

Now I pose to the reader if it is not true that in the discussion of witness Brown underlying his testimony, he was stating elements of fact relating to commonly accepted practices in reductions in force, and proper methods of treating employees who were entitled to the benefit of the obligation of good faith and fair dealing. There was enough in the record to give the jury a basis for determining his credibility, and the weight to be given his evidence, and his opinion on the ultimate issue would be weighed by the jury in the light of the underlying testimony.

Witness Brown testified to the recognized procedures that an employer should follow before terminating a long-term employee entitled to the protection of the implied duty placed on employers for good faith and fair dealing in the termination. Whether or not the employer conformed to those recognized procedures and exercised good faith and fair dealing was always a factual question, and the opinion testimony of Brown reflected no more than ultimate inferences based on his underlying testimony of facts.

The expert should always be permitted to draw inferences for which the jury would not be competent to draw especially when the prejudicial impact of the opinion testimony did not outweigh its probative value to the trier of fact. United States v. Milton (5th Cir. 1977), 555 F.2d 1198. Rule 704 expressly permits testimony in the form of "an opinion or inference."

Brown's testimony as an expert met the true test for expert testimony set out in McGuire v. Nelson (1975), 167 Mont. 188, 200, 536 P.2d 768, 775:

> The true test would seem to be whether the subject is sufficiently complex so as to be susceptible to opinion evidence, and whether the witness is properly qualified to give his opinion. Here, there is no doubt that the relationship of the suspension system of the front wheel of a CT200 99 c.c. Honda trail bike to its tire size would not be common knowledge to members of the jury, but a question of mechanical engineering. Also, there is no doubt that Prussing is well qualified to testify on the matter. In view of the fact that the jury can either reject or accept the expert witness' opinion or give limited weight to it, we fail to see how the admission of the evidence here could constitute a usurpation of the jury's function.

The jury after all is the final arbiter, even of the expert's opinion. That facet of this case has been lost to the majority.

III.

Latitude for Business Decisions versus the Duty of Good Faith and Fair Dealing

We have pointed out above, without setting forth the instructions in full, that the District Court carefully instructed the jury on the essentials pertaining to the covenant of good faith and fair dealing in employment cases based upon the prior decisions

43

of this Court.

The majority opinion is rife with statements in retroflexion of the principles announced by this Court in earlier cases. We find such sentences as "We agree with Modern that these instructions placed the jury in the middle of general management decisions, in effect eviscerating the concept of employer latitude in decision-making." (Slip op. at 17, 18.) Again, "There is no justification for giving a jury the authority to review whether reasonable care was utilized in a reduction in force based on economic conditions." (Slip op. at 18.) Then there is the improbable statement that "We conclude that the employer is not under a duty to use reasonable care in decision-making." (Slip op. at 19.)

How far the majority bend backwards in the majority opinion from our earlier positions of law on this subject is demonstrated in this paragraph from Dare v. Montana Petroleum Marketing Company (Weber, J.) (1984), 212 Mont. 274, 282, 687 P.2d 1015, 1020:

> Whether a covenant of good faith dealing is implied in a particular case depends upon objective manifestations by the employer giving rise to the employee's reasonable belief that he or she has job security and will be treated fairly. Gates, 638 P.2d at 1067, 39 St.Rep. at 20. The presence of such facts indicates that the term of employment has gone beyond the indefinite period contemplated in the at will employment statute, § 39-2-503, MCA, and is founded upon some more secure and objective basis. In such cases, the implied covenant protects the investment of the employee who in good faith accepts and maintains employment reasonably believing their job is secure so long as they perform their duties satisfactorily. Such an employee is protected from bad faith or unfair treatment by the employer to which the employee may be subject due to the inherent inequality of bargaining power present in many employment

relationships. <u>The implied covenant seeks to strike a balance between the interests of the employer in controlling the work force and the interests of the employee in job security</u>. <u>Gates</u>, 638 P.2d at 1066-67, 39 St.Rep. at 20.

In Kerr v. Gibson's Products Company of Bozeman (1987), 226 Mont. 69, 733 P.2d 1292, this Court permitted the review of a discharge during a reduction in force. There, the evidence indicated that the employer had an ulterior motive in discharging the employee. In this case, the jury found, as the District Court noted when it denied the post-trial motion, that the motive of Modern Machinery in discharging Heltborg was not legitimately for a reduction in force but to get rid of a highly paid, long-term employee. Under the concepts of fairness and justice that are the rock-based foundation of the covenant of good faith and fair dealing, an employer forced to reduce its work force because of economic conditions is not thereby absolved of the duty of good faith. Perhaps it is increased, because when forced lay-offs occur, the reduction should take place in accordance with the procedures outlined by Mr. Brown: proper notice, possible severance pay, assignments to other positions in the company or affiliated companies (Modern Machinery is one of many subsidiaries), or severance pay. Here, Modern Machinery failed completely to consider any of these options. It cold-bloodedly terminated a 22-year employee without so much as a thank-you. To say that the jury decision in this case eviscerated the latitude of the employer in decision-making is empty rhetoric; what has been disemboweled here are fairly established concepts of the duty of

good faith and fair dealing on an employer forced to a reduction in force.

The majority opinion is a return to the outmoded theory that a long-term employment may be terminated without cause. We condemned that in Nye v. Department of Livestock (1982), 196 Mont. 222, 228, 639 P.2d 498, 502, saying:

> [T]he tort of wrongful discharge may apply to an at-will employment situation. In fact, the theory of wrongful discharge has developed in response to the harshness of the application of the at-will doctrine, under which an employment may be terminated without cause . . . The determination of whether the cause of action arises rests upon whether an unfair or unjustified termination was in violation of public policy. (Citing authority.)

It was in Dare, above cited, that we moved away from requiring a finding of public policy, instead stating that implication of the covenant depended upon existence of "objective manifestations by the employer giving rise to the employee's reasonable belief that he or she has job security and will be treated fairly." Dare, 687 P.2d at 1020.

Not only had Modern Machinery acquired key-man insurance on Heltborg as an employee, but six months prior to his summary discharge, he had turned down an employment opportunity with another concern because he felt his employment at Modern Machinery was more secure. Modern Machinery's previous treatment of him and their attitude toward him gave rise as objective manifestations to his feeling of job security.

IV.

Elimination of Punitive Damages for Intentional Breaches of the

46

Covenant

The majority opinion now holds that the breach of the implied covenant of good faith and fair dealing in employment cases is not a tort, but a breach of contract. This has an unanticipated side effect, serendipitous for employers that now even intentional breaches will not merit punitive damages.

Remedies for the breach of the implied covenant of good faith and fair dealing in employment cases now seem to have been statutorily subsumed in the Wrongful Discharge From Employment Act, § 39-2-901, et seq., MCA. At least it can be said for the Act that the remedies provided by the legislature for wrongful discharge are more generous than are those of the majority of this Court, since the Act includes punitive damages. Section 39-2-905, MCA.

V.

Conclusion

I dissent from the majority opinion in all particulars and would affirm the judgment of the District Court.

John C. Sheehy
_____
Justice

I concur in the foregoing dissent of Justice John C. Sheehy.

William E. Hunt
_____
Justice

Justice John Conway Harrison joins in the foregoing dissent of Justice John C. Sheehy.

John Conway Harrison
_____
Justice

47